**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

<table>
<tr><td>
GARY S. WADE,

                   Plaintiff,

        v.

MICHAEL COLANER, <u>et</u> <u>al.</u>

                Defendants.
</td><td>
:
:
:
:
:
:
:
:
:
:
:
:
</td><td>
Civil Action No. 06-3715 (FLW)

**OPINION**
</td></tr>
</table>

**<u>WOLFSON, United States District Judge</u>**:

Presently before the Court is a Motion for Summary Judgment by defendants, State Trooper Michael Colaner and State Trooper David Ryan (collectively "Defendants"), to dismiss Plaintiff Gary Wade's ("Plaintiff" or "Wade") Complaint alleging unreasonable use of excessive force.  In short, Defendants contend that the facts of record – specifically, the videotape of the alleged excessive force incident – demonstrate beyond any material dispute that the conduct of Defendants was objectively reasonable under the circumstances and not in violation of clearly established law, such that Defendants are immune from suit under the doctrine of qualified immunity.  This Court disagrees and denied Defendants' Motion for Summary Judgment on the record after hearing oral argument on March 19, 2010.  The instant Opinion sets forth the basis for that ruling.

## I.  BACKGROUND

### A.  Procedural History

Plaintiff initiated this action on August 1, 2006.  On March 20, 2009, this Court granted an unopposed motion for summary judgment filed by Chief Gerald M. Turning and the Borough of Tinton Falls (collectively "Tinton Falls Defendants"), dismissing the Tinton Falls Defendants from the case.[1]  This Court also considered in the March 20, 2009 Opinion and Order, an unopposed motion to dismiss filed by Defendants Colaner and Ryan.  This Court granted Defendants' motion to dismiss Plaintiff's deliberate indifference claim, but permitted Plaintiff to proceed with his excessive force claim, instructing Plaintiff to notify the Court within twenty days whether he wished to proceed with his remaining claim.  The Court found that while not raised by Defendants in the motion to dismiss,[2] the doctrine enunciated in Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) did not apply to his excessive force claim, but did operate to bar Plaintiff from re-litigating factual issues previously decided during his criminal trial for obstruction of the administration of law and careless driving.  Additionally, the Court noted that while qualified immunity was not raised by Defendants in their motion to dismiss, the Defendants could later raise the issue on a motion for summary judgment.

---

[1]  By Order dated April 1, 2009, judgment was entered in favor of the Borough of Tinton Falls against Plaintiff in the amount of $13,059.32.

[2]  Defendants relied on res judicata and collateral estoppel in their original motion papers, without mention of the Heck doctrine.

By letter dated April 2, 2009, *pro se* Plaintiff[3] informed the Court that he intended to proceed with his excessive force claim against Defendants Colaner and Ryan. Thereafter on April 17, 2009,[4] Defendants moved for reconsideration of this Court's denial of the motion to dismiss Plaintiff's excessive force claim. On June 17, 2009, this Court denied Defendants' motion for reconsideration, noting that the expert declarations, Attorney General handbooks and Federal Monitors Report relied upon by Defendants in support of the motion for reconsideration were not originally submitted to the Court and could not appropriately be considered in the context of Defendants' motion to dismiss. In short, this Court ruled that Defendants could not "relitigate a summary judgment motion that never was", as part of their motion for reconsideration. This Court likewise rejected the other grounds asserted by Defendants for reconsideration. Specifically, the Court found no error in its determination that Plaintiff was struck in the back of the head by Defendant Colaner, given that the Court had the benefit of viewing the videotape that captured the entire incident.[5]  Additionally, this Court rejected Defendants' contention that the municipal court judge had previously ruled at Plaintiff's criminal trial that no

---

[3]     Although originally represented by counsel, in light of issues that arose between initial counsel and Plaintiff, by Order dated November 5, 2007, the Honorable Tonianne J. Bongiovanni, U.S.M.J. ordered that "[p]laintiff shall retain new counsel on or before November 30, 2007 or else Plaintiff will be deemed *pro se*." Having failed to retain new counsel, Plaintiff was deemed *pro se* by Order dated December 3, 2007, and Plaintiff failed to submit any opposition to the motions filed by the Tinton Falls Defendants or Defendants Colaner and Ryan. Following this Court's consideration of those motions, however, Judge Bongiovanni appointed *pro bono* counsel to Plaintiff by Order dated October 1, 2009.  Accordingly, Plaintiff is now represented by counsel.

[4]     Defendants were granted an extension of time within which to file the motion for reconsideration.

[5]     As this Court noted in the June 17, 2009 Reconsideration Opinion, the videotape was appropriately considered as it was explicitly relied upon in Plaintiff's Complaint.

excessive force was used.  Finally, the Court rejected Defendants contention that given the New Jersey Attorney General's Policy on Use of Force Sanctions, this Court improperly considered the non-violent nature of Plaintiff's unlawful conduct.  As this Court held, the protections of the Fourth Amendment are not subordinate to the Attorney General's guidelines on the use of force while effectuating arrest.

Defendants now move for summary judgment on what they assert is Plaintiff's only remaining claim -- that Defendants "violated his civil rights by engaging in excessive force at the time of the stop."  Review of the Complaint reveals, however, that Count Two which sets forth Plaintiff's excessive force claim, alleges that Defendant Colaner alone engaged in excessive force in violation of the 4th and 14th Amendments. Defendant Ryan's conduct is addressed in Count Four, wherein Plaintiff alleges that Ryan "aided and abetted" Colaner's violations of Plaintiff's constitutional rights by failing to intervene to prevent Colaner from subjecting Plaintiff to excessive force. Accordingly, while the parties do not specifically address Plaintiff's aiding and abetting claim against Ryan in the instant motion, that claim necessarily rests on Plaintiff's excessive force claim against Colaner.[6]

**B.  Facts**

The parties dispute certain of the relevant facts in this case.  Because the Court is considering the facts in the context of Defendants' motion for summary judgment, the Court must view the facts in the light most favorable to Plaintiff.  As this Court noted in

---

[6]     A § 1983 claim for the failure to stop the use of excessive force rises to the level of a constitutional violation if excessive force was used and such defendants had a reasonable opportunity to prevent the use of excessive force.  See, e.g., Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).  While Plaintiff has labeled the claim in Count Four as one of "aiding and abetting," Plaintiff's claim is presumably one based upon the failure to stop the use of excessive force.

the March 20, 2009 Opinion, however, in accordance with Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Court will not draw inferences in Plaintiff's favor that would necessarily negate the findings of the municipal court and the affirmance of the New Jersey Superior Court and the Appellate Division in connection with Plaintiff's conviction of the obstruction of the administration of law.  See Ference v. Township of Hamilton, 538 F.Supp.2d 785, 790 (D.N.J. 2008). Moreover, the Court will not draw inferences in Plaintiff's favor that are inconsistent with the events depicted in the videotape which captures the events giving rise to Plaintiff's excessive force claim. See Scott v. Harris, 550 U.S. 372, 380-81, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment . . . [and thus,] the Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").   Accordingly, wherever possible the Court has relied upon the videotape to state the facts of the case.

**1.  Colaner Stops Wade for Speeding**

On the morning of August 17, 2004, Plaintiff was driving an unmarked police car on his way to work as a police officer in the Borough of Tinton Falls.  Declaration of Gary Wade ("Wade Dec. at ¶ __."), ¶ 2-3.  As Plaintiff was proceeding northbound on the Garden State Parkway, he was pulled over by New Jersey State Trooper Michael Colaner due to his erratic driving at a speed in excess of the 65 mile per hour limit.  Id. at ¶ 4; Certification of Alex Keoskey ("Keoskey Cert. at ¶ __."), Ex. C(2).  After pulling Plaintiff over, Defendant Colaner parked his car behind Plaintiff's vehicle.  Within moments, New Jersey State Trooper David Ryan arrived as backup.  While Plaintiff's

vehicle did not have a license plate that identified it has a municipal car, it did have emergency lights, which Plaintiff activated at the moment that he was pulled over. Id. at ¶¶ 3-4. In addition, Plaintiff's vehicle had a side mirror search-light, extra antennae, computer, and police radio. Id. at ¶ 3. After pulling Plaintiff's car over, Defendant Colaner called the license plate in for investigation. Declaration of Thomas A. Cunniff ("Cunniff Dec."), Ex. A, at 56:8-57:10. Defendant Colaner, however, did not wait for a response as to whether the car was indeed a police car, and instead approached Wade's vehicle. Id.

The arrest incident giving rise to Plaintiff's excessive force claim was recorded by the dash-mounted video and audio recording system in Defendant Colaner's patrol car, which automatically activated at the time of the stop. See Final Pretrial Order, Docket No. 83, Stipulated Fact E. As Defendant Colaner was not actively patrolling, the recording system took time to warm up. Id. Consequently, the system began recording approximately twenty-five (25) seconds after Defendant Colaner activated his lights and siren. Id. At that point, the cars were pulled over on the shoulder of the Parkway. See Keoskey Cert. at Ex. A(1); Videotape ("Video at --:--:--.") at 09:08:23. The parties agree that the alleged "excessive force" incident unfolds during the three-minute segment, from 9:09 a.m. to 9:12 a.m., that captures Plaintiff's arrest.

## 2. **When Plaintiff and Colaner Argue, Colaner Pulls Out his Weapon**

When Defendant Colaner approached the driver's side window of Plaintiff's vehicle, Plaintiff asked the reason for the stop. See Video at 09:08:50, Keoskey Cert., Ex. A(2) at 2. There is some dispute as to whether Colaner responded to Plaintiff's question, but it is clear that at that point Colaner demanded Plaintiff's license,

registration, and insurance card.  See Video at 09:08:53; Keoskey Cert., Ex. A(2) at 2.[7]
Plaintiff asked Defendant Colaner a second time why he was being stopped, however,
Defendant Colaner offered no explanation for the stop and continued to demand
Plaintiff's license, registration, and insurance card.  See Video at 09:08:55; Keoskey
Cert., Ex. A(2) at 2.  It is at this point that Defendant Ryan approached the passenger's
side of Plaintiff's vehicle.  See Video at 09:08:55.  Plaintiff requested that a supervisor be
sent out and told Defendant Colaner that he had no reason to pull Plaintiff over within the
municipal limits of Tinton Falls.  See Video at 09:08:57-09:05; Keoskey Cert., Ex. A(2)
at 2.  In response, Defendant Colaner advised Plaintiff that he was "plac[ing] [him] under
arrest for disorderly conduct."  See Video at 09:09:06-10; Keoskey Cert., Ex. A(2) at 2.
Plaintiff then used his radio to request a supervisor from the Tinton Falls Police
Department.  See Video at 09:09:11-30.

While Plaintiff was on his radio, Colaner asked if he was a police officer and if he
was carrying a weapon.  See Video at 09:09:13-20; Keoskey Cert., Ex. A(2) at 2.
Plaintiff contends that without getting a response from Plaintiff, Colaner pulled his
handgun from its holster and directly pointed it at Wade's face, mere inches away.  See
Video at 09:09:20; Wade Dec., ¶ 9.  In Colaner's September 21, 2004 Investigation
Report, however, he reported that he brandished his weapon "after gaining the
acknowledgment of the presence of a weapon by Mr. Wade."  Keoskey Cert., Ex. B at 4.
It is unclear from the transcripts and from the viewing the video whether Plaintiff
indicated that he had a weapon before Colaner pulled out his gun, as certain portions of

---

[7]     In their Statement of Undisputed Material Facts, Defendants contend that Colaner
indeed explained why he had stopped Plaintiff.  Defendants' Statement of Undisputed
Material Facts at ¶ 6.  Colaner cannot be heard on the video stating the reasons for the
stop, however, portions of the videotape are inaudible.

the tape are inaudible.  However, in upholding the municipal court decision, the Superior Court judge expressly found that "Colaner had drawn his own weapon as he was asking Wade if he was armed."  T10:17-18; Keoskey Cert., Ex. C(2).[8]  When Plaintiff finished with the radio transmission, he told Colaner and Ryan that a supervisor was reporting to the scene.  See Video at 09:09:32; Keoskey Cert., Ex. A(2) at 2.  In response to Colaner's repeated questioning, Plaintiff answered Colaner, informing him that he was a police officer.  See Video at 09:09:44; Keoskey Cert., Ex. A(2) at 2.  When Colaner asked where his weapon was, Plaintiff responded that it was strapped around his ankle.  See Video at 09:09:48; Keoskey Cert., Ex. A(2) at 2.  Colaner then asked Plaintiff for his identification, however, told him not to retrieve it.  See Video at 09:09:52; Keoskey Cert., Ex. A(2) at 2.  Plaintiff responded that his identification was located in his bag, and that his badge was on his belt.  See Video at 09:09:53-55; Keoskey Cert., Ex. A(2) at 2.  Plaintiff then showed Colaner his badge.  See Wade Dec. at ¶ 11.  Throughout this exchange, Colaner maintained his weapon pointed in the direction of Wade's vehicle.  See Video at 09:09:20-09:10:10.

### 3.  Plaintiff Told Colaner He Would Let Colaner Handcuff Him

Colaner then opened the driver's side door of Plaintiff's vehicle and asked again where Plaintiff's weapon was.  See Video at 09:10:02-05.  Plaintiff, for the second time, reported his weapon's location.  See Video at 09:10:05.  Colaner attempted to reach for it, however, Plaintiff asked Colaner not to do so – a request Plaintiff claims is consistent

---

[8]     As was noted by this Court in the March 20, 2009 Opinion, Plaintiff's account of what occurred prior to his arrest has been discredited in connection with his municipal court conviction of obstruction of the administration of law and careless driving.  Indeed, in its ruling, the municipal court stated that after viewing the video of the incident, the court was inclined to accept the defendants' account of what transpired.  Accordingly, the Court will not recount facts inconsistent with these findings.

with police protocol.  <u>See</u> Video at 09:10:06; Keoskey Cert., Ex. A(2) at 3; Wade Dec., ¶ 12 & Ex. A at 3.  Colaner claims that Plaintiff pushed his hand away; Plaintiff, however, proffers statements showing otherwise.  <u>See</u> Wade Dec. at ¶ 12.  At the time of this exchange, Plaintiff was inside the vehicle and Colaner was reaching into the vehicle, so what actually occurred was not captured on video. Colaner then placed his firearm back in its holster, took out his handcuffs, reached into Plaintiff's vehicle, and grabbed Plaintiff to handcuff him.  <u>See</u> Video at 09:10:10-17.  Throughout this, Plaintiff repeatedly asked Colaner to "[r]elax," and outright told Colaner "I'll let you cuff me." <u>See</u> Videotape at 09:10:15-21; Keoskey Cert., Ex. A(2) at 3; Wade Decl., Ex. A at 3. Contrary to Colaner's claim, the videotape can be viewed to demonstrate that Plaintiff did not resist Colaner's efforts to handcuff him.

Immediately after this exchange, Colaner again ordered Plaintiff out of the vehicle, and attempted to forcibly remove Plaintiff from the driver's seat.  Plaintiff, however, was still strapped by the seatbelt--as he pointed out to Colaner.  <u>See</u> Video at 09:10:22-24. Colaner ignored Plaintiff's indication; continued to order him out of the car; and forcibly removed him from the seat.  Plaintiff then asked Colaner to unclip the seatbelt; Ryan, from the passenger side, reached in to unbuckle the seatbelt.  <u>See</u> Wade Dec. at ¶ 14. Plaintiff then asked Colaner and Ryan to let his arm out of the seatbelt, so he could get out.   Video at 09:10:27-31; Keoskey Cert., Ex. A(2) at 3.  Without any apparent resistance from Plaintiff, Colaner placed the handcuff on Plaintiff's left wrist.  <u>See</u> Video at 09:10:31-39.  Plaintiff requested that he be let out of the car; Colaner ordered him out of the car.  <u>Id.</u> at 09:10:37-41.  Cooperating with Colaner's order, Plaintiff exited the vehicle while Colaner held onto the handcuff that was clasped around Plaintiff's left wrist.  <u>Id.</u> at 09:10:40-43.  During this period, Ryan left his position near the passenger

side and relocated to the rear of Plaintiff's vehicle, near the area where Plaintiff and Colaner were situated.  Id. at 09:10:41-45.  Ryan, at no time during the preceding events, drew out his weapon.  Id.

### 4. **Colaner Strikes and Sprays Plaintiff**

The videotape clearly shows that while Plaintiff was exiting the vehicle, Colaner was fiercely shaking a can of pepper spray in his right hand.  Id. at 09:10:42.  Plaintiff exited the vehicle, turned his back to Colaner, and dropped his right hand down behind his back presumably so that Colaner could complete handcuffing him.  Id. at 09:10:43-46; Wade Dec. at ¶ 18.  At that point, Colaner ordered Plaintiff to get on the ground.  Id. at 09:10:43; Keoskey Cert., Ex. A(2) at 3.  Plaintiff responded by telling Colaner that he would not get on the ground.  Id. at 09:10:45; Keoskey Cert., Ex. A(2) at 3.  According to Plaintiff, he was concerned that lying on the ground, at the side of the Parkway, was not safe.  See Wade Dec. at ¶ 19.  The videotape does not show any pressing reason to complete handcuffing Plaintiff on the ground; Plaintiff stood idle with his back to Colaner as Colaner firmly gripped his left wrist.

Rather than complete the handcuffing of Plaintiff, Colaner drew his right fist back and struck the back of Plaintiff's head.  See Video at 09:10:46; Wade Dec. at ¶ 20.  Colaner then pushed Plaintiff to the ground as he sprayed him with pepper spray.  Id. at 09:10:47-52.  Once Plaintiff was on the ground, Colaner placed the second handcuff on Plaintiff's right wrist.  Id. at 09:10:52-09:11:17.  Despite his placement on the ground, the audio from the videotape shows, with clarity, that Colaner yelled "[s]top resisting!" three times at Plaintiff.  Plaintiff immediately and calmly responded to each declaration with "I'm not resisting."  Id.  at 9:11:04 - 9:11:08.  After handcuffing Plaintiff, both Colaner and Ryan escorted Plaintiff to their police vehicle.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed. 202 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Anderson, 477 U.S. at 248.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 447 U.S. at 255)); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment.  Celotex, 477 U.S. at 330.  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001). The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted).  Under Anderson, Plaintiffs' proffered evidence must be

sufficient to meet the substantive evidentiary standard the jury would have to use at trial. 477 U.S. at 255.  To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quotations omitted); see also Matsushita, 475 U.S. at 586; Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999).  In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249.  Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322-23.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323; Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992).

## III.  DISCUSSION

The sole issue for this Court on the instant motion is whether Plaintiff's excessive force claim (Count Two), and presumably his aiding and abetting claim which hinges on the success of the excessive force claim (Count Four), are barred by the doctrine of qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'."  Bayer v. Monroe County Children & Youth Servs., 577 F.3d 186, 191 (3d

Cir.2009) (quoting Pearson v. Callahan, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)).

More simply stated, qualified immunity is "an entitlement not to stand trial or face the

other burdens of litigation . . . ." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806,

86 L.Ed.2d 411 (1985). This defense strikes a balance, shielding those officers from

liability that mistakenly, but reasonably, believed their actions were lawful while

permitting a plaintiff to recover against those defendants that knowingly violated the

plaintiff's rights. Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007).

　　　　In assessing whether qualified immunity applies, courts consider two inquiries: (i)

whether the facts alleged, when viewed in the light most favorable to the party asserting

the injury, show the officer's conduct violated a constitutional right; and (ii) whether the

right that was [allegedly] violated was clearly established, i.e., whether it would be clear

to a reasonable officer that his conduct was unlawful in the situation he confronted.

Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (*overruled,

in part,* by a unanimous Court in Pearson, 129 S.Ct. at 818, which relaxed the rigid two-

step application of the Saucier analysis in favor of a more flexible approach that permits

judges of district courts and courts of appeals "to exercise their sound discretion in

deciding which of the two prongs of the qualified immunity analysis should be addressed

first"). Accordingly, in assessing whether Defendants are entitled to qualified immunity,

the Court examines whether Plaintiff has alleged the violation of a constitutional right

and whether that right was clearly established. As previously noted, the Supreme Court

made clear in Pearson, that it is within the discretion of this court which of the two

prongs of the qualified immunity test to address first. However, "[i]f the answer to either

question is 'no,' the analysis may end there." Matos v. City of Camden, No. 06-205

(NLH), 2009 WL 737101, * 3 (D.N.J. Mar. 18, 2009) (citing Pearson, 129 S.Ct. at 823).

**A.  Deprivation of a Constitutional Right**

As was noted by this Court in its March 20, 2009 Opinion, the use of excessive force can constitute an unlawful "seizure" under the Fourth Amendment. See Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004).  When construing an excessive force claim, this Court must consider whether the officer's use of force was objectively reasonable under the circumstances, regardless of the official's underlying motive or intentions.  Graham, 490 U.S. at 397.  In Graham, the Supreme Court expounded on the reasonableness inquiry, stating that it "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id.; see also Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005)(quoting Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004) (finding an officer entitled to qualified immunity on excessive force claim "'after resolving all factual disputes in favor of the plaintiff, [ ] the officer's use of force was objectively reasonable under the circumstances.'").  In addition, the Third Circuit has noted other relevant factors including "the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997) (abrogated on other grounds by Curley v. Klem, 499 F.3d 199 (3d Cir. 2007)); see also Couden v. Duffy, 446 F.3d 483, 496-97 (3d Cir. 2006).

When weighing these factors, courts should evaluate the officers' conduct from the officers' vantage point at the time of the incident; thus the reasonableness of a

particular use of force

> must be judged from the perspective of a reasonable officer on the
> scene, rather than with the 20/20 vision of hindsight . . . Not every push
> or shove, even if it may later seem unnecessary in the peace of a
> judge's chambers, violates the Fourth Amendment.  The calculus of
> reasonableness must embody allowance for the fact that police officers
> are often forced to make split-second judgments - in circumstances that
> are tense, uncertain, and rapidly evolving - about the amount of force
> that is necessary in a particular situation.

Graham, 490 U.S. at 396-97 (internal quotations and citations omitted).

Turning first to whether a jury could find that Plaintiff was deprived of a

constitutional right, Defendants argue that the videotape establishes "beyond any material

dispute, that Troopers Colaner and Ryan were confronted with an underlined armed suspect who was

acting belligerently and who, especially, was refusing to cooperate in the surrender of a

concealed holstered handgun that was at all times within his ready reach.   In such

circumstances, any officer would have reason to fear for his own safety, and would be

authorized, by law, to use reasonable force to gain control of the situation, whether or not

the suspect was known to be a police officer."  Defendants' Br. at 12.   Defendants cite

the New Jersey Attorney General's Use of Force Policy in effect at the time of the 2004

stop which, they argue, specifically authorizes "wrestling a resisting subject to the

ground" when necessary to overcome a person's physical resistance to an officer's

authority.  See Keoskey Cert., Exh. E., page 3.  Moreover, Defendants contend that "[t]he

use of force sufficient to immobilize a belligerent, non-cooperative suspect armed with a

loaded handgun is reasonable under the Fourth Amendment, and falls squarely in the

zone of objective legal reasonableness for qualified immunity purposes."  Defendants'

Br. at 12 (citing Graham, 490 U.S. at 396).  Defendants reason that given the undisputed

fact that Plaintiff was armed with a concealed handgun within reach, Defendants "would

have been constitutionally justified to use substantially greater force then [sic] they in fact used."  Defendants' Br. at 13.  Moreover, Defendants contend that even if they were mistaken in believing that Plaintiff was an immediate threat to their safety, it was objectively reasonable for them to have formed such a belief.  Defendants reason that "[t]he circumstances involved in the August 2004 stop are exactly the type of 'tense, uncertain, and rapidly evolving' events that the Supreme Court has cautioned should not be subject to 'second-guessing with 20/20 hindsight.'" Defendants' Br. at 13.

The problem with Defendants' analysis is that it fails to account for the fact that at the time Colaner struck Plaintiff, Plaintiff was already out of his vehicle and standing with his back to Colaner, with one wrist handcuffed and his free hand dropped behind his back so that Colaner could finish handcuffing him.  Video at 09:10:43-46.  As Plaintiff points out, at the time that Colaner struck Plaintiff, he already had a firm grip on Plaintiff's handcuffed left hand (id.) and Plaintiff had already indicated that he would let Colaner handcuff him (Video at 09:10:15-21; Keoskey Cert., Ex. A(2) at 3; Wade Dec., Ex. A at 3).  The events depicted by the videotape, which indisputedly captured the events, do not, as Defendants suggest, contradict Plaintiff's version of events such that no reasonable jury could find that Defendants violated the Fourth Amendment.  Indeed, the videotape is consistent with Plaintiff's version of events.  The video does not depict the sort of tense, uncertain events that Defendants contend transpired.  Ryan's conduct during the course of the arrest bolsters Plaintiff's contention that Plaintiff posed no immediate threat to the troopers.   At no time did Ryan brandish his weapon. Significantly, as Colaner was extracting Plaintiff from his vehicle, Ryan can be viewed on the videotape walking at a normal gait around the vehicle, without even a glance in the direction of Colaner and Plaintiff until he approached them.   The events that

transpired on video belie Colaner's contention that the use of pepper spray and blunt force was required to subdue Plaintiff.

In Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007), the Supreme Court noted that the existence in the record of a videotape capturing the events underlying an excessive force claim presents an "added wrinkle" to the usual standard which requires courts "to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" (Citations omitted).   As previously noted, the Court instructed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment."  Scott, 550 U.S. at 380.  Under such circumstances, the Supreme Court held, a court should view "the facts in the light depicted by the videotape."  Id. at 380-81.

Here, viewing the facts in the light depicted by the videotape, the Court finds that it is Defendants' version of the events which is contradicted by the videotape.  A jury could indeed view the videotape and find consistent with Plaintiff's version of events that Colaner's conduct in striking Plaintiff on the back of the head and using the pepper spray after Plaintiff had already been partially restrained and appeared compliant was not objectively reasonable.  Accordingly, a reasonable factfinder could conclude that Colaner used excessive force against Plaintiff thereby violating his Fourth Amendment rights. Plaintiff's excessive force claim therefore survives the first step in the qualified immunity analysis.

The Court's finding in this regard is limited to Colaner's striking of Plaintiff's head and spraying pepper spray and does not encompass the events involving Colaner's

brandishing of his weapon.   Though the Court must  consider the totality of the circumstances, see Curley v. Klem, 499 F.3d at 207, analytically, Plaintiff's excessive force claim can be divided into two allegations of excessive force: one involving Colaner's striking of Plaintiff's head and use of pepper spray and one involving Colaner's brandishing of his weapon.  The circumstances surrounding Colaner's drawing his weapon when he did, indicate a use of force that was objectively reasonable as a matter of law.  The Graham and Sharar factors support this conclusion.  Indeed, in the context of the surrounding circumstances depicted on the videotape, Colaner was fully justified in drawing his weapon when he did.   At that point in the arrest, the circumstances showed a degree of urgency such that it was objectively reasonable for Colaner to draw his weapon.

Even assuming the fact that Colaner drew his weapon before Plaintiff affirmatively responded that he was a police officer and that he had a weapon, the Court still finds Colaner's conduct objectively reasonable.   Given that Plaintiff was not responding to Colaner's inquiries as to whether he was an officer and whether he was armed, a jury could indeed conclude that Plaintiff posed an immediate threat to the safety of the troopers and to other drivers on the Parkway.   At the point in the arrest when Colaner drew his weapon, Plaintiff was clearly not compliant with Colaner's directives. Moreover, the duration of Colaner's brandishing of his weapon was relatively brief. Prior to removing Plaintiff from the vehicle, and subsequent to learning the location of Plaintiff's weapon, Colaner re-holstered the weapon.   Accordingly, the Court finds that Colaner's brandishing of his weapon does not rise to the level of a constitutional violation and Defendants are therefore entitled to qualified immunity in connection with Plaintiff's allegations of excessive force which involve the brandishing of Colaner's

weapon.[9]

### B. Clearly Established Right

Having determined that sufficient evidence exists in connection with Colaner's striking of Plaintiff's head and use of pepper spray such that Defendants have violated Plaintiff's Fourth Amendment right to be free from unlawful seizure, the Court turns to whether the right that was violated was clearly established. To answer that question, a court must determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted. See Curley v. Klem, 499 F.3d at 207 ("The question at this second [Saucier] step is whether the right that was violated was clearly established, or, in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted.'") (quoting Saucier, 533 U.S. at 202). In excessive force cases, the issue is not whether the use of force was excessive under the circumstances, but rather, whether "the right the official is alleged to have violated [was] 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable officer would understand that what he was doing violates that right." Saucier, 533 U.S. at 201-02.

Thus, at this point in the qualified immunity analysis, the issue is no longer whether a reasonable jury could find, given Plaintiff's version of the events, that Colaner's actions were objectively unreasonable. The point of the second step in the qualified immunity analysis is that room for reasonable disagreement about the

---

[9]     Because the Court finds no violation of a constitutional right in connection with the brandishing of the weapon, the Court's discussion, infra, at step two in the qualified immunity analysis, shall be limited to whether Colaner's striking Plaintiff and use of pepper spray violated a clearly established right. See Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

application of law is not enough.  Plaintiff's claim can only survive the second step of the qualified immunity analysis if, given his version of events, there is no room for reasonable disagreement among reasonable troopers as to the lawfulness of Colaner's actions: "Officers who make reasonable mistakes as to what the law requires are entitled to qualified immunity."  Green v. New Jersey State Police, 246 Fed.Appx. 158, 162 (3d Cir. 2007).   Thus, the right at issue is "clearly established" only if it would be unreasonable for officers to believe that Colaner's actions would not constitute excessive force.  See Id. at 163.

The Fourth Amendment does not require Colaner to have relied upon verbal instructions alone to effect an arrest, especially where Plaintiff had previously failed to comply with instructions.  However, a police officer effecting an arrest may only use the force that is necessary: a "plaintiff may bring a claim pursuant to § 1983 where police use more force than is necessary to arrest him."   Thomas v. City of Erie, 236 Fed.Appx. 772, 776 (3d Cir. 2007).  Here, Colaner struck Plaintiff while Plaintiff was standing with one hand cuffed and the other hand dropped behind his back waiting to be cuffed.  In such circumstances, the Court finds that it would be unreasonable for troopers to believe that Colaner's actions in striking Plaintiff and subsequently using pepper spray in response to Plaintiff's refusal to comply with Colaner's instruction to lie on the ground would not constitute excessive force.   There was simply no urgency under the circumstances that could justify the use of force that Colaner exercised.

In support of the instant Motion, Defendants point to the Attorney General's Use of Force Policy in effect at the time of the stop, arguing that it expressly "authorizes 'wrestling a resisting subject to the ground' when necessary to overcome a person's physical resistance to an officer's authority."  Defendants' Br. at 12.  As Plaintiff points

out, however, the policy does not in fact "authorize" wrestling a resisting subject to the ground as an appropriate use of force.  Rather, the Policy merely includes wrestling a resisting subject to the ground as an example of the physical force that *may* be "necessary to overcome a subject's physical resistance to the exertion of the law enforcement officer's authority, or to protect persons or property."   Keoskey Cert. at ¶ 9, Ex. E. Instead, the Policy provides as follows:

> The use of force should never be considered routine.  In determining to use force, the law enforcement officer shall be guided by the principle that the degree of force employed in any situation should be only that reasonably necessary.  Law enforcement officers should exhaust all other reasonable means before resorting to the use of force. It is the policy of the State of New Jersey that law enforcement officers will use only that force which is objectively reasonable and necessary.

Colaner's conduct in striking Plaintiff and using pepper spray to force Plaintiff to the ground cannot reasonably be thought to be "within the bounds of appropriate police responses."   Saucier, 533 U.S. at 208.   Here, where Plaintiff was already partially restrained and had been subdued, Colaner's use of blunt force and pepper spray served no purpose other than to inflict discomfort and pain.  This is not the "hazy border between excessive and acceptable force."   Green, 246 Fed.Appx. at 162 (quoting Saucier, 533 U.S. at 206).

The Court need not cite to a specific case to properly find that the law on this point is "clearly established."   As the Third Circuit has explained: "In the context of excessive force claims, we have relied on the factors set forth in Graham and Sharrar in evaluating whether an officer made a reasonable mistake.  We have stated that these factors are 'well-recognized,' and that when an officer applies them in 'an unreasonable manner, he is not entitled to qualified immunity.'"  Id. at 162-63 (citations omitted).  No

reasonable application of the Graham and Sharar factors could justify Colaner's use of force under the circumstances here.   The mere fact that Plaintiff was under arrest, coupled with the fact that the use of force was brief, and the fact that Plaintiff had his weapon holstered on his ankle are not enough for Colaner to have reasonably thought it was lawful to strike Plaintiff on the back of the head and administer pepper spray because Plaintiff, though subdued, refused to lie on the ground.   There is no room for reasonable legal mistake about the matter.

Accordingly, Defendants are not entitled to the defense of qualified immunity in connection with Plaintiff's claim that Defendants used excessive force in striking him and using pepper spray and Defendants' motion for summary judgment is denied.   A jury will have to decide the facts based upon its assessment of the evidence and then, based upon those proven facts, whether the force was excessive.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on the basis of qualified immunity is denied.

Dated: April 12, 2010

  /s/ Freda L. Wolfson
FREDA L. WOLFSON, U.S.D.J.