**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        )
GARY S. WADE,                           )          Civil Action No.: 06-3715-FLW
                                        )
              Plaintiff,                )          **OPINION**
v.                                      )
                                        )
MICHAEL COLANER,                        )
                                        )
              Defendant.                )
_____ )

**WOLFSON, United States District Judge:**

This case was tried to a jury from April 19 to April 26, 2010.  On the last day, the jury

returned a verdict in favor of Plaintiff Gary S. Wade ("Plaintiff" or "Wade") and against

Defendant State Trooper Michael Colaner, ("Defendant" or "Colaner") on Plaintiff's claim of

excessive force under 42 U.S.C. § 1983.[1]  The jury awarded Plaintiff $500,000 in compensatory

damages and $4.5 million in punitive damages.  Colaner now moves for judgment under FED. R.

CIV. P. 50(b) or, in the alternative, for a new trial under FED. R. CIV. P. 59.  Defendant's Rule

50(b) motion is premised on his assertions that (1) he should have been held immune from the

excessive force claim under the doctrine of qualified immunity; (2) the question of whether his

conduct constituted excessive force should have been decided by the Court; (3) the result of this

case  impermissibly conflicts with findings made during the state court proceedings surrounding

---

[1]        At the close of trial, and before submitting the case to the jury, the Court dismissed
defendant Michacl Ryan ("Ryan"), a New Jersey State Trooper, who was present at the time of
the incident between Plaintiff and Defendant, from the case and granted him judgment as a
matter of law pursuant to FED. R. CIV. P. 50(a). (4/22/10 Tr. at 136-138).  The claim against Ryan
was that he aided and abetted Colaner.

Plaintiff's criminal charges; and (4) the issue of punitive damages should not have been submitted to the jury because the evidence could not support a rational finding that Colaner acted with reckless or callous disregard of Plaintiff's rights.  In the alternative, Defendant requests a new trial pursuant to Rule 59, contending that the jury's determination was the result of emotion and passion, and is not rationally supported by the trial record.  Defendant also advances seven trial errors that he contends entitle him to a new trial.  Finally, Defendant seeks a substantial remittitur of both the compensatory and punitive damage awards.

For the reasons set forth below, Colaner's Rule 50(b) and Rule 59 motions are DENIED. The motion for remittitur is DENIED as to the jury's compensatory damage award, but GRANTED as to punitive damages.

## I. BACKGROUND – FACTS AND PROCEDURAL HISTORY

### A. Defendant's Use of Force

The account of the incident, upon which Plaintiff's claims arose, is based on a videotape of the stop and arrest involving Wade and Colaner, (*See* Doc. No. 73-3, Ex. A-1),[2] and the testimony of the witnesses.  The Court remarks at the outset, that the video, which was audio and video taped by a recorder attached to the dashboard of Defendant's state police vehicle, is the most potent and best evidence that accurately portrays the incident at issue.[3]  In fact, Defendant, in his earlier-filed summary judgment papers, conceded this fact, and urged the Court to view the video tape in resolving his motion.  Indeed, because of that tape, the Court denied Defendant's motion based on qualified immunity and allowed Plaintiff's excessive force claim to proceed to

---

[2]       A copy of the video was introduced into evidence as J-1. *See* 4/19/10 Tr. at 47.

[3]       The lengthy background and procedural history of this case is more fully set forth in previous Opinions and orders of this Court issued on March 20, 2009 (Doc. No. 40), June 17, 2009 (Doc. No. 50), and April 13, 2010 (Doc. No. 88), which are hereby incorporated by reference.

trial.  At trial, the jury had the opportunity to repeatedly view the tape; the jury not only saw what transpired between Colaner and Wade, but it was able to hear the verbal exchange between the parties, including their tones and inflections.  The recitation of most the salient evidence follows.

On August 17, 2004, Wade, a detective with the Borough of Tinton Falls police department, was traveling northbound on the Garden State Parkway in Tinton Falls in an unmarked police car when Defendant pulled him over for speeding. (4/19/10 Tr. at 16:13-23; 42:6-8). After initiating the stop, Colaner turned on his dash-mounted video and audio recording system which recorded the stop. (4/21/10 Tr. at 40:17-19; Doc. No. 83, Stipulated Fact E).  The Court notes that defendant Trooper Ryan was present at all times during the arrest.  However, as shown on the recording, Ryan walked to, and remained, at the passenger side of Wade's car, and his demeanor contrasted Colaner's behavior.  In fact, because the Court found at trial that Ryan remained claim and under control throughout the arrest -- even during the confrontation between Colaner and Wade -- and that Ryan did not employ, or aid or abet Colaner in the use of, any excessive force, the Court granted him judgment as a matter of law.  In that regard, the following facts will focus on the exchange between Colaner and Wade.

When Colaner approached Wade's car, Wade repeatedly asked why he had been pulled over. (*See* Doc. No. 77-3, Keoskey Cert., Ex. A(1); Video at 09:08:50; 4/19/10 Tr. at 52:17-18). Without responding, Colaner demanded Plaintiff produce his license, registration, and insurance card. (*See* Video at 09:08:53; 4/19/10 Tr. at 52:19-23). Wade requested that a supervisor be sent out and told Colaner he had no reason to pull Wade over in his own town. (*See* Video at 09:08:57-09:05; 4/19/10 Tr. at 53:6-7, 93:14-17). In response, Colaner advised Wade that he was placing him under arrest for disorderly conduct. (*See* Video at 09:09:06-10; 4/19/10 Tr. at 53:8-

14). Wade then requested a Tinton Falls supervisor over his radio, which Wade contends was in compliance with the policy of his police department. (*See* Video at 09:09:11-30; 4/19/10 Tr. at 53:19-54:7).

　　While Wade was on the radio, Colaner asked Wade if he was a police officer and if he was carrying a weapon. (*See* Video at 09:09:13-20; 4/19/10 Tr. at 55:13-20).  Wade did not immediately respond.  According to Plaintiff, Colaner next pulled out his handgun and pointed it at Wade's face. (*See* Video at 09:09:20; 4/19/10 Tr. at 56:24-57:3).  However, according to Colaner, he brandished his weapon "after gaining the acknowledgement of the presence of a weapon by Mr. Wade."  (Doc. No. 77-3, Keoskey Cert., Ex. B at 4).  When Wade got off the radio, he told Colaner that he had a supervisor coming out to the scene, (*see* Video at 09:09:32; 4/19/10 Tr. at 56:4-10), and that he was a police officer.  (*See* Video at 09:09:44; 4/19/10 Tr. at 57:7-13).  When Colaner asked where his weapon was, Wade told him it was on his ankle. (*See* Video at 09:09:48; 4/19/10 Tr. at 57:17-25).  Colaner then asked Wade to identify the location of his ID, but told Wade not to retrieve it.  (*See* Video at 09:09:52; 4/19/10 Tr. at 58:17-20).  Wade responded that his ID was in his bag and that his badge was on his belt. (*See* Video at 9:09:53-55; 4/19/10 Tr. at 58:21-23).  Throughout this exchange, Colaner maintained his weapon pointed in the direction of Wade's vehicle.  (*See* Video at 9:09:20-09:10:10).

　　Colaner then proceeded to open the driver's side door of Plaintiff's vehicle, while at the same time asking again the location of Plaintiff's weapon.  (*See* Video at 09:10:02-05; 4/19/10 Tr. at 60:7-10).  Plaintiff, for the second time, responded that it was on his ankle. (*See* Video at 09:10:05).  When Colaner reached for Wade's weapon, Wade asked Plaintiff not to touch it, a request Plaintiff claims was consistent with his police training, as well as his own safety fears because the weapon, a Glock, does not have a safety.  (*See* Video at 09:10:06; 4/19/10 Tr. at

60:9-25).   Both parties dispute whether Wade brushed Colaner's arm away at this point. (4/19/10 Tr. at 62:18-21; 4/21/10 Tr. at 61:1-10).   Colaner then placed his firearm back in its holster, took out his handcuffs, reached into Plaintiff's vehicle, and grabbed Plaintiff to handcuff him. (*See* Video at 09:10:10-17; 4/19/10 Tr. at 62:22-63:4; 64:11-15).   During this effort, Wade repeatedly asked Colaner to "[r]elax," and told Colaner that he would let Colaner handcuff him. (*See* Video at 09:10:15-21; 4/19/10 Tr. at 63:7-22).

Colaner then ordered Wade out of the car and tried to forcibly pull him out, but, as Wade pointed out to Colaner, his seatbelt was still latched. (*See* Video at 09:10:22-24; 4/19/10 Tr. at 64:11-19). Nevertheless, Colaner continued to order Wade out of the car and again tried to pull him out, and Wade asked him to unclip the seatbelt. (*See* Video at 09:10:24-26).   Plaintiff then asked Colaner to let his arm out of the seatbelt so he could exit the car.   (*See* Video at 09:10:27-31).   Without any apparent resistance from Wade, Colaner placed the handcuff on his left wrist. (*See* Video at 09:10:31-39; 4/19/10 Tr. at 63:2-4). Wade exited the vehicle while Colaner held onto the handcuff that was clasped around Plaintiff's left wrist.   (*See* Video at 09:10:41-43; 4/19/10 Tr. at 66:18-67:19).   The videotape clearly shows that while Plaintiff was exiting the vehicle, Colaner was rigorously shaking a can of pepper spray in his right hand.   (*See* Video at 09:10:42; 4/21/10 Tr. at 154:16-18).   Wade got out of the car, turned his back to Colaner, and dropped his right hand down behind his back.   (*See* Video at 09:10:43-46; 4/19/10 Tr. at 67:10-23).   Colaner then directed Wade to get on the ground next to his car, which was parked along the Parkway.   However, Wade refused to drop down because, as he testified at trial, the car was parked too close to incoming traffic.   Next, rather than finish the handcuffing of Wade, Colaner drew back his right fist – with a can of pepper spray in that hand – and struck Wade in the back of his head. (*See* Video at 09:10:46; 4/19/10 Tr. at 123:14-25). Wade, staggered by the force of

the blow, was dragged by Colaner and the second trooper on the scene, Ryan, to the ground, while Colaner sprayed Wade in the back of the head with pepper spray. (*See* Video at 09:10:47-52; 4/19/10 Tr. at 70:6-71:16).   Once Wade was on the ground, Colaner placed the second handcuff on Plaintiff's right wrist. (*See* Video at 09:10:52-9:11:17).  With no apparent resistance from Wade, Colaner yelled numerous times at Wade to "stop resisting," who immediately and calmly responded to each declaration, "I'm not resisting." (*See Id.*; 4/19/10 Tr. at 72:12-20).

**B. Plaintiff's State Court Proceedings**

On March 9, 2006, after a full trial by the Borough of Freehold Municipal Court, Plaintiff was convicted of careless driving and obstruction, but acquitted of resisting arrest.  (*See* Doc. No. 26-2, Ex. D).  Plaintiff appealed his convictions to the Superior Court of New Jersey, Law Division, and the Superior Court of New Jersey, Appellate Division. Both courts affirmed.  (*See* Doc. No. 73-2, Ex. C(3); Doc. No. 73-2, Ex. F).

**C. Excessive Force Claim Tried to a Jury**

This action was initiated by Plaintiff on August 1, 2006.[4]  On January 22, 2010, Colaner and Ryan filed a motion for summary judgment limited to the issue of whether they were entitled to qualified immunity in connection with Plaintiff's excessive force claim.  (Doc. No. 77).  On March 19, 2010, following oral argument, this Court denied that motion and, on April 13, 2010, issued an opinion setting forth the basis for that ruling.  *See Wade*, 2010 U.S. Dist LEXIS 36210 at *1-*2. (Doc. No. 88).  In evaluating the merits of the claims by Colaner and Ryan for qualified

---

[4]      Prior to trial, this Court took the following actions: (1) two defendants were dismissed from the case, leaving Colaner and Ryan as the remaining defendants; and (2) dismissed Plaintiff's deliberate indifference claim against Colaner and Ryan but permitted Plaintiff to proceed with his claims of excessive force against the pair.  In that context, the Court limited the excessive force claim to Colaner's use of pepper spray and his physical strike against Wade. Based on qualified immunity, the Court dismissed Plaintiff's claim that Colaner used excessive force by brandishing his gun during the arrest.

immunity, using the two-prong test that requires a plaintiff claiming excessive force to have alleged both the violation of a Constitutional right and that the right was 'clearly established' at the time of the violation, the Court found that Plaintiff had sufficiently pled the claim against Colaner and Ryan.  *Id.* at *1.   On April 19, 2010, the matter proceeded to a jury trial on the excessive force issue.  (Doc. No. 93).

At trial, Plaintiff's expert witness James A. Williams ("Williams"), a specialist in police procedures, police policy, and the use of force – whose qualifications Colaner did not object to at trial – concluded that Colaner's use of force was excessive. (4/20/10 Tr. at 18:15-22, 22:18-23:8). Williams testified that Wade was under Colaner's complete control at the time Wade exited the vehicle and Colaner struck him, and that Wade had turned his back to Colaner in an act of submission. (*Id.* at 35:20-36:17). Williams further testified that Colaner's blow to the back of Wade's head was excessive and "unreasonable, unnecessary and potentially dangerous." (*Id.* at 40:4-21). Because Wade was under the control of both Colaner and Ryan, who were taking Wade to the ground, Williams testified that the use of pepper spray was similarly inappropriate. (*Id.* at 44:09-19).

Moreover, Williams testified that striking a person in the base of the head with a closed fist, with an object in the fist to strengthen it, indicates that the strike was intended as a punitive measure to cause pain, and not for a legitimate law enforcement purpose. (*Id.* at 41:17-42:21; 43:12-44:3). Further, he noted that Ryan never acted as though there was a threat and never pulled his own weapon. (*Id.* at 33:22-34:5; 38:19-21). This comports with Williams' conclusion that, under the circumstances, neither belligerence nor the fact that Wade had a weapon justified Colaner's excessive use of force. (*Id.* at 44:23-45:13).

The jury also heard evidence regarding Colaner's non-compliance with the New Jersey Attorney General's Use of Force Policy ("the Attorney General's Policy" or "the Policy"). The Policy calls for law enforcement officers to exercise "utmost restraint," and to "exhaust all other reasonable means before resorting to the use of force." (Doc. No. 77-4, Keoskey Cert., Ex. E at 38).[5] The Policy requires law enforcement officers to complete both an underlying incident report and a use of force report "[i]n all instances when physical, mechanical, or deadly force is used." (*Id.* at 45). During the trial, the jury heard evidence that although Colaner submitted both reports, each time he disclosed only his use of pepper spray, leaving out that he punched Wade in the back of his head. In the incident report, he wrote, "I not only stood my ground but pressed forward to achieve a lawful objective [–] overcoming [Defendant's] physical resistance[,]" but did not mention the blow he delivered to Wade's head. (Doc. No. 77-3, Keoskey Cert., Ex. B at 17). Indeed, in his Use of Force Report, Colaner checked "chemical" force, and not physical force, even though the form expressly requires the trooper to "check all that apply." When questioned about this, Colaner first answered that he only needed to check the "highest level" of force that he used. (4/21/10 Tr. at 178:10-13). He also claimed that the force he used to handcuff Wade did not constitute a reportable use of force because he thought Wade was only offering "minimal resistance." (*Id.* at 103:6-9; 176:11-177:7).

Plaintiff presented evidence at trial to demonstrate the physical harm he suffered at the time of the incident, as well as the continuing psychological effects. The jury heard evidence of

---

[5]      The Policy specifically provides that a law enforcement officer may use physical or mechanical force only when the officer reasonably believes that it is immediately necessary at the time: (a) to overcome resistance directed at the officer or others; (b) to protect the officer, or a third party, from unlawful force; (c) to protect property; or (d) to effect other lawful objectives, such as to make an arrest. (*Id.* at 42-43). Physical force is defined to include actions such as "wrestling a resisting subject to the ground," or "striking with the hands or feet." (*Id.* at 41). Likewise, mechanical force is defined to include spraying with a chemical agent.  (*See Id.*).

Wade suffering two sprained wrists and a lump in the back of his head that gave him headaches for a week following the incident.  (4/19/10 Tr. at 74:7-17).  Additionally, the pepper spray caused Plaintiff to suffer burning and irritation of his eyes, back, and head. (*Id.* at 74:18-21; 4/21/10 Tr. at 10:4-13).   Psychologically, Wade claimed to still suffer anxiety that leads to difficulty breathing (4/19/10 Tr. at 75-76), as well as persistent flashbacks (*Id.* at 76:3-6, 80-81), nightmares (*Id.* at 75:7-13, 80:11-24), recurring headaches (*Id.* at 80:3-10), and difficulty with sleeping and eating. (*Id.* at 79:1-80:2).  Wade also testified that the incident left him afraid of the police (*Id.* at 75:7-17, 78:3-20) and of driving long distances (*Id.* at 75:7-20, 77:25-78:2), caused him to lose interest in friends (*Id.* at 82:4-15) and the enjoyment of life (*Id.* at 81:13-82:15), and left him vigilant and aware. (*Id.* at 82:16-22).  Plaintiff testified that he changed the license plates on his personal car out of fear that the vanity tags he used previously would allow state police to identify him.  (*Id.* at 83:2-15).

Wade's wife, Bonnie, also testified to the psychological impact that Colaner's conduct has had on Wade, changing him from a very outgoing person to someone who no longer wants to be around people and prefers to stay inside (4/21/10 Tr. at 5:19-6:10, 21:19-22:2), negatively impacting his sleeping and eating habits (*Id.* at 14:22-15:7, 18:20-19:17), and triggering symptoms of anxiety such as difficulty breathing when driving on highways. (*Id.* at 15:8-16:18). The psychological injuries Wade continues to suffer from have also had a negative impact on Wade's relationship with his wife. (*Id.* at 22:3-8).

Wade also presented evidence that, approximately two years after the incident, he sought counseling with Dr. Koppel, a licensed social worker, as a result of the high levels of anxiety. (4/22/10 Tr. at 3:24-25, 5:8-17).  Dr. Koppel also noticed the psychological injuries that Colaner's conduct inflicted upon Wade, and diagnosed Wade with post-traumatic stress

syndrome. (*Id.* at 8:1-5).  During his testimony, Koppel referenced Wade's emotional problems, which included his fear of the police and anxiety, as well as issues relating to the litigation process, having a gun pointed at him by Colaner, and his fall-out with his employer.  (*Id.* at 6-7, 11-12, 15-16).  Plaintiff only saw Dr. Koppel once.  (*Id.* at 11:14-15).  Dr. Dawson Shoemaker, who saw Wade the day after the attack, diagnosed Wade with "acute anxiety disorder." (4/20/10 Tr. at 81:21-24).

Colaner offered the testimony of Mickie McComb, a sergeant first class in the New Jersey State Police Training Academy and the assistant unit head of the Firearms Self-Defense Unit.  As a trainer, McComb testified that, according to the Standard Use of Force Legal Preamble for all New Jersey State Police, police recruits are taught to treat an armed driver with an "extreme heightened awareness and caution[.]"  (4/22/10 Tr. at 22, 26).  More specifically, McComb testified that: "We teach that anyone with a weapon, you should have an extreme heightened awareness and caution, and take proper approaches, and be on your guard because you don't know what could transpire. So you are very alert and you never take anything for granted. So until you could rule out certain aspects of the stop, they have to be completely -- treat them differently, like a high risk situation."  (*Id.* at 26).  On cross, McComb testified that state police should "use force only when and to the extent necessary and use only force that is reasonable in relation to the harm [one seeks] to prevent." (*Id.* at 32).   In addition, consistent with the policy, McComb testified that state police would have to report every incident of use of force during an arrest subject to a few exceptions, such as "handcuffing with no or minimal resistance" or "pushing, pulling or blocking the subject to counter minimal resistance." (*Id.* at 36-37).[6]

---

[6]      John J. Ryan, the defense's expert witness, testified regarding the **Error! Main**

Defendant also offered the testimony of psychiatrist Dr. Jeffrey Berman ("Berman"), who testified about the contents of a written report he prepared for the Court. (4/22/10 Tr. at 100:4-8). The report was based upon a two-and-a-half-hour psychiatric evaluation Berman had conducted on Plaintiff approximately two months prior to the report. (*Id*. at 100:9-15, 101:6-8). Berman reviewed the symptoms of post-traumatic stress disorder, and concluded that Plaintiff was not suffering from the disorder. (*Id*. at 101-104). When questioned by Defendant's counsel, Berman conceded that Wade's symptoms were consistent with generalized anxiety disorder. (4/22/10 Tr. at 108:5-9).

## D. POST-TRIAL MOTIONS AND JURY VERDICT

Following the conclusion of the evidence, Colaner and Ryan moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). (*See* 4/22/10 Tr. at 129, 132, 137). This Court granted Ryan's motion for judgment as a matter of law, finding that testimony in the case "demonstrate[d] that no jury could reasonably find a sufficient evidentiary basis to find that [Ryan] aided and abetted in this matter." (*See Id.* at 136-38). This Court did not grant Colaner's motion, explaining:

---

**Document Only.**police's procedures with respect to the use of force during an arrest. (*See* 4/22/10 Tr. at 63-67). Essentially,on direct, Ryan opined that Colaner's use of force was consistent with standard police procedures. (*Id.* at 69). Notably, on cross, contrary to the depictions of the video, Ryan testified that Wade was non-complaint throughout the incident; that instead of moving his right arm behind his back, Wade moved his arm away from Colaner (*See Id.* at 78); that instead of striking Wade with his fist, Colaner struck Wade with his forearm (*See Id.* at 82-83); and that although Wade only offered minimal resistance, Colaner was justified in using force because Wade had a gun strapped to his ankle (*See Id.* at 81).

> I need not belabor this. I entered a ruling in this matter. Indeed, based on the testimony at trial, frankly, it's only strengthened I believe what my finding was based on the testimony I've heard and what has transpired at trial. There is certainly at this point no basis for dismissing these charges; that I could in no way find that a reasonable jury would not have a legally sufficient evidentiary basis to find there was excessive force used here.

(*See Id*. at 137:16-25).

Before closing arguments, the Court had a lengthy conference with counsel to discuss the jury charge and jury verdict form.  Neither party objected to the final charge or verdict form. (4/23/10 Tr. at 3:7-20).  The purpose of the verdict form, as it related to punitive damages, was to inquire whether the jury found that punitive damages should be awarded.  (*Id.* at 3:8-4:6).  If the jury answered in the affirmative, then the Court planned to allow the parties to introduce additional evidence, after which the Court would lay out instructions for the jury to consider before quantifying an award.  (*Id.* at 80:16-80:25).  However, when the jury deliberated and filled out the verdict form, instead of only answering 'yes' or 'no' to the punitive damages question, the jury responded in the affirmative and awarded $7.5 million in punitive damages to the Defendant.  (*Id.* at 83:5-12).  The Court explained that the jury had made a mistake by calculating the damages before hearing further instructions. (*Id.*).  Defendant moved for judgment notwithstanding the verdict, arguing that the $7.5 million punitive damages award showed that the jury had been "prejudiced and inflamed," and as such, the verdict should be disregarded, or a new jury should be impaneled so that a non-prejudiced group could decide punitive damages.  (*Id.* at 82:14-83:12).  The Court denied this motion, stating, "[w]hen you say they have been inflamed, they've heard nothing other than the facts, as to whether making a determination that [Defendant's conduct] was malicious and wanton. . ." (*Id.* at 83:13-84:12).

The Court reconvened the jury and provided a supplemental instruction on punitive damages.  (*Id.* at 87:13-89:3).  Defendant then produced evidence, through the testimony of

Colaner, concerning Defendant's net worth, namely that he had a $300,000 mortgage on a home worth approximately $400,000.   (*Id.* at 89:16-90:15).   During the jury's deliberations on the punitive damages award, the jury posed the following question to the Court: "Is [Colaner] the only source to pay the punitive award?"   (Doc. No. 98)   The Court responded, with the concurrence of counsel, by instructing, "You are to consider only the evidence presented in this case and not whether there is an additional source to pay the punitive award."   (Doc. No. 98). Thereafter, the jury returned with a punitive award in the amount of $4.5 million.

Following the jury's verdict in favor of Plaintiff, which found that Defendant used excessive force against Plaintiff, and that Defendant was liable for the sum of $500,000 in compensatory damages and $4.5 million in punitive damages, (Doc. No. 99), on May 21, 2010, Defendants filed the instant renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or, in the alternative, a new trial pursuant to Federal Rule of Civil Procedure 59 or remittitur of the damage awards. (Doc. No. 110, "Def.'s Br.").

## II. DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(b).

At the conclusion of the jury trial, the Court denied Colaner's motion for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.  The Court explained that it had already "entered a ruling in this matter[,]" and that the testimony heard at trial had only strengthened its conclusion.  (*See* 4/22/10 137:16-22).  "[This Court] could in no way find that a reasonable jury would not have a legally sufficient evidentiary basis to find there was excessive force used here."  (*See Id.* at 137:22-25).  The ruling referenced by the Court was the denial of the summary judgment motion in *Wade*, 2010 U.S. Dist LEXIS 36210, wherein the Court found that a "reasonable factfinder could conclude that Colaner used excessive force

against Plaintiff" and that "there is no room for reasonable legal mistake" about the legality of Defendant's use of force. *Id.* at *28, *35. Because "[t]he standard for granting summary judgment under Rule 56 mirrors the standard for a directed verdict under FED. R. CIV. P. 50(a)[,]" *Glenn Distribs. Corp. v. Carisle Plastics, Inc.*, 297 F.3d 294, 299 (3d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)), this Court now again applies those standards to the evidence presented in connection with Defendant's use of force to deny his renewed motion for judgment as a matter of law under Rule 50(b).

**A. Standard of Review – Rule 50(b)**

Rule 50(a) provides that "[i]f a party has been fully heard on an issue during a jury trial," a court may grant a motion for judgment as a matter of law where the "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party . . ." *See* FED. R. CIV. P. 50(a). If the motion made under Rule 50(a) is denied by the court, the party may file a renewed motion for judgment as a matter of law under Rule 50(b) no later than ten days after judgment is entered. *See Levine v. Voorhees Bd. of Educ.*, No. 07-1614, 2010 WL 2735303 at *1 (D.N.J. July 9, 2010) (citing FED. R. CIV. P. 50(b)). Rule 50(b) provides that, in deciding a 50(b) motion, the court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *See* FED. R. CIV. P. 50(b).

Judgment as a matter of law under Rule 50 "should only be granted if the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Levine*, 2010 WL 2735303 at *1. (quoting *Raiczyk v. Ocean County Veterinary Hospital*, 377 F.3d 266, 269 (3d Cir. 2004) (internal quotation marks omitted) (citing another source)). "The question is not whether there is literally no evidence supporting the unsuccessful

party, but whether there is evidence upon which a reasonable jury could properly have found its verdict." *Id.* (quoting *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003) (internal quotations marks omitted) (citing another source)).

**B. Discussion**

In the instant motion for judgment as a matter of law, Defendant again argues that Plaintiff's excessive force claim fails to meet both prongs of the qualified immunity test. Defendant further asserts that the Court erred in finding that the question of excessiveness was a factual one for the jury, rather than a legal one for this Court. Defendant next argues that the result in this case impermissibly conflicts with findings made by the state court during Plaintiff's criminal proceedings following his arrest. Lastly, Defendant contends that the issue of punitive damages should not have been submitted to the jury. For the reasons set forth below, Defendant's motion is denied.

**i. Qualified Immunity**

In its summary judgment ruling, this Court explained the doctrine of qualified immunity and its two-prong test:

> 'The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'. *Bayer v. Monroe County Children & Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009) (quoting *Pearson v. Callahan*, --- U.S. ----, ----, 129 S.Ct. 808, 815 (2009)). More simply stated, qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation . . ..' *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). This defense strikes a balance, shielding those officers from liability that mistakenly, but reasonably, believed their actions were lawful while permitting a plaintiff to recover against those defendants that knowingly violated the plaintiff's rights. *Curley v. Klem*, 499 F.3d 199, 206-07 (3d Cir. 2007).
>
> In assessing whether qualified immunity applies, courts consider two inquiries: (i) whether the facts alleged, when viewed in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (ii) whether the right that was [allegedly] violated was clearly established, i.e .,

whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (*overruled, in part*, by a unanimous Court in *Pearson*, 129 S.Ct. at 818, which relaxed the rigid two-step application of the Saucier analysis in favor of a more flexible approach that permits judges of district courts and courts of appeals 'to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first'). Accordingly, in assessing whether [Colaner and Ryan] are entitled to qualified immunity, the Court examines whether Plaintiff has alleged the violation of a constitutional right and whether that right was clearly established. As previously noted, the Supreme Court made clear in *Pearson*, that it is within the discretion of this court which of the two prongs of the qualified immunity test to address first. However, '[i]f the answer to either question is 'no,' the analysis may end there.' *Matos v. City of Camden*, No. 06-205(NLH), 2009 WL 737101, *3 (D.N.J. Mar. 18, 2009) (citing *Pearson*, 129 S.Ct. at 823).

*Wade*, 2010 U.S. Dist LEXIS 36210 at *20-*22.   The same analysis applies to Defendant's present argument.

**a. Prong One: Deprivation of a Constitutional Right**

The use of excessive force is an unlawful seizure under the Fourth Amendment and constitutes a constitutional violation.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006); *Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005).  Claims alleging the use of excessive force in the course of an arrest "should be analyzed under the Fourth Amendment and its 'reasonableness' standard," under which a court inquires if the officer's "actions are 'objectively reasonable' in light of the facts and circumstances confronting them."  *Graham*, 490 U.S. at 395, 397.  In *Graham*, the Supreme Court explained that the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Since the *Graham* decision, the Third Circuit has noted other relevant factors that a court should consider, including: "[whether] the

16

physical force applied was of such an extent as to lead to injury[;] . . . the possibility that the persons subject to the police action are themselves violent or dangerous[;] the duration of the action[;] whether the action takes place in the context of effecting an arrest[;] the possibility that the suspect may be armed[;] and the number of persons with whom the police officers must contend at one time." *Estate of Smith*, 430 F.3d at 150 (quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Curley*, 499 F.3d 199).

The Supreme Court has cautioned, however, that in weighing these factors to determine the reasonableness of a particular use of force, an officer's conduct

> must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

*Graham,* 490 U.S. at 396-97 (citations omitted) (internal quotation marks omitted).

Defendant argues that, as a matter of law, the force he used against Plaintiff was not excessive under the circumstances.  First, Defendant contends that from the moment Plaintiff responded in the affirmative to his queries about whether Plaintiff was in possession of a weapon, as a matter of law Defendant was "entitled to disarm [P]laintiff, and was entitled to reasonable cooperation from him in the disarming process; and . . . in the event of non-cooperation, [Defendant] was entitled to use force to immobilize [P]laintiff and neutralize the weapon."  (Def.'s Br. at 10).  Defendant characterizes Plaintiff's refusal to turn over his weapon as a display of "defiance, of a most unambiguous nature."  (Def.'s Br. at 10).  Second, Defendant claims that the jury's finding of excessive force puts the case in conflict with established case law.

With regard to Defendant's first argument, that he was entitled to use force to immobilize Plaintiff because he was armed and non-cooperative, this Court's previous analysis is still applicable.

> The problem with [Colaner and Ryan's] analysis is that it fails to account for the fact that at the time Colaner struck Plaintiff, Plaintiff was already out of his vehicle and standing with his back to Colaner, with one wrist handcuffed and his free hand dropped behind his back so that Colaner could finish handcuffing him. As Plaintiff points out, at the time that Colaner struck Plaintiff, he already had a firm grip on Plaintiff's handcuffed left hand and Plaintiff had already indicated that he would let Colaner handcuff him.  The events depicted by the videotape, which indisputably captured the events, do not, as [Colaner and Ryan] suggest, contradict Plaintiff's version of events such that no reasonable jury could find that [Colaner and Ryan] violated the Fourth Amendment. Indeed, the videotape is consistent with Plaintiff's version of events. The video does not depict the sort of tense, uncertain events that [Colaner and Ryan] contend transpired. Ryan's conduct during the course of the arrest bolsters Plaintiff's contention that Plaintiff posed no immediate threat to the troopers. At no time did Ryan brandish his weapon. Significantly, as Colaner was extracting Plaintiff from his vehicle, Ryan can be viewed on the videotape walking at a normal gait around the vehicle, without even a glance in the direction of Colaner and Plaintiff until he approached them. The events that transpired on video belie Colaner's contention that the use of pepper spray and blunt force was required to subdue Plaintiff.

*Wade*, 2010 U.S. Dist LEXIS 36210 at *25-*27.  This previous finding of the Court was further strengthened when Colaner was cross-examined during trial.  Colaner admitted that, at the time of the arrest, he "believe[d] [Plaintiff] was offering minimal resistance."  (4/21/10 Tr. at 103:8-9).  Additionally, when shown the videotape and questioned, Colaner admitted that he "didn't tell him until four seconds after his arm was out from behind his body . . . to stop resisting[.]"  (4/21/10 Tr. at 173:20-175:3).  As a result, this argument is unconvincing.

Defendant's second argument on this point, that the result in this case conflicts with binding case law, is similarly unavailing.  Defendant consistently asserts that the use of force against an armed, non-cooperative suspect has been approved by courts.  However, no case cited

by Defendant lends itself to a finding that Defendant's use of force did not constitute excessive force.[7]

As Defendant points out, the Third Circuit has recognized that officers facing individuals who are suspected to be violent and known to be armed are of special concern in the *Graham* analysis.  Thus, in *Mellot v. Heemer*, 161 F.3d 117, 122-123 (3d Cir. 1998), *cert. denied*, 526 U.S. 1160 (1999), where deputy marshals effecting a court-ordered eviction pointed loaded firearms at persons in the house and twice pushed an evictee into a chair, the court found the employed methods objectively reasonable based on several factors, including: the lack of physical injury to any plaintiff; the presence of fewer than ten officers to contend with the five individuals who were on the property; and the fact that the "the marshals had significant reason

---

[7]      Defendant cites many out-of-Circuit cases that are factually dissimilar to the case at hand; some are even helpful to Plaintiff because, in those cases, the plaintiffs were actively or passively resisting arrest over a prolonged period of time, and force was used after the issuance of warnings.  *See Meecham v. Frazier*, 500 F.3d 1200, 1204-1205 (10th Cir. 2007) (no excessive force when, during a traffic stop that turned into a "fifty-minute ordeal requiring arrest" because the plaintiff refused to answer questions, stop talking on her cell phone, or get out of her car, and after repeated warnings, officers used pepper spray to bring the woman out of the car and onto the ground); *Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir. 1994) (ample evidence supported the jury's conclusion that officers who used pain compliance arrest techniques on trespassing protestors, but did not deliver any physical blows or cuts, had not used excessive force); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (not excessive force for police officer to use taser during a traffic stop where plaintiff's hostility, belligerence, refusal to comply with several requests from the officer created a "tense and uncertain situation," and officer's use caused no injury); *Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 410 (D. Vt. 2009) (no excessive force where officers, forty minutes after arriving to a property and spending time trying to use less intrusive means of arrest, tased protestors).  Further, Defendant cites *Phillips v. James*, 422 F.3d 1075, 1083-1084 (10th Cir. 2005) for the proposition that an "officer's use of deadly force was found objectively reasonable where plaintiff resisted and was armed . . . ."  (Def.'s Br. at 17).  As Plaintiff correctly points out, this is an "egregious characterization" of *Phillips*, where "the drunk and medicated [plaintiff] had locked himself in the bedroom with numerous firearms and refused to come out, repeatedly threatened to shoot the officers, and stated that he had pulled a weapon on officers in the past.  After the officers heard sounds of a shotgun being chambered, and tried to negotiate with the suspect for an hour, the suspect came outside holding a gun, took note of the officers stationed around the house, went back inside the house, propped up a window in apparent preparation of shooting at the SWAT team, and advised the officers that he had a clean shot at them."  (Pl.'s Br. at 17-18) (citing *Phillips*, 422 F.3d at 1078-79).

to fear armed confrontation" in light of an evictee's ownership of numerous firearms and his previous threats to shoot any federal agent who came onto his property. *See also Sharrar*, 128 F.3d at 816, 821-22 (finding that police's actions, in response to a violent domestic assault that involved the use of a gun, to surround house containing four suspects with twenty police officers – including a SWAT team armed with machine guns – and then force the compliant suspects to exit the house and lie face-down in the dirt, at which point the officers held guns to their heads while yelling obscenities and threatening to "blow [their] heads off if they moved," while "Rambo-type behavior . . . [that came] close to the line, [the] circumstances, in totality, [did] not rise to a Fourth Amendment violation.").

Defendant's use of force is not justified under this argument. Here, unlike in *Mellot*, there was no uncertainty regarding the location of Plaintiff's weapon, Defendant had no reason to believe that Wade was potentially violent, Wade did suffer injuries, and Colaner and Ryan had no other suspects with whom to contend. Further, at the time Colaner struck his blow, Colaner was already aware that Plaintiff was a police officer and not an armed felon on the road. It was not reasonable for Colaner to have feared armed confrontation. Indeed, Ryan testified on cross-examination that he never pulled out his weapon or pepper spray during the incident, and also confirmed previous testimony he'd given in  municipal court, wherein he stated it was belief that, "you are not going to get a bad guy that says, [']My weapon is here.[']" as Wade did.  (Tr. 4/21/10 at 212-13, 220:2-4).

The Third Circuit has permitted police to use force on individuals who, unlike Wade, were actively and physically resisting arrest.  In *Feldman v. Cmty. Coll. Of Allegheny*, 85 Fed. App. 821, 826 (3d. Cir. 2004), in which the plaintiff alleged that an arresting police officer kicked him in the head while trying to remove him from a college campus as a trespasser, the

court found that summary judgment was properly granted in the defendants' favor because, even if the plaintiff's accusation was true, the kick to the head was an objectively reasonable response to a plaintiff who was "actively struggling" against officers who were attempting to remove him. In the same vein, in *Brown v. Reinhart*, 325 Fed. Appx. 47, 49 (3d Cir. 2009), the plaintiff was being arrested on a disorderly conduct offense when he began "pulling away and laying on his hands to avoid being handcuffed." *Id.* After a verbal warning, one police officer pepper sprayed the plaintiff, allowing the officers to gain control of his left hand. In order to gain control of plaintiff's right hand, the named defendant police officer "used his right knee to deliver a 'stun blow' to [the plaintiff's] right thigh," a tactic that allowed officers to handcuff the plaintiff. *Id.* The Court found that the defendant officer's use of force was objectively reasonable under the circumstances, "especially in light of Brown's active resistance to arrest." *Id.* at 51.

The same result has been reached with suspects who offer passive resistance. S*ee Thomas v. City of Erie*, 236 Fed. Appx. 772, 776 (3d Cir. 2007) (excessive force not present when the plaintiff, who admitted to going limp and dropping to the ground with his hands underneath his body when officers were trying to place him under arrest, was forced to the ground and later inadvertently hit his head on the police van he was placed in); *Cruz v. City of Wilmington*, 814 F. Supp. 405, 412-13 (D. Del. 1993) (no excessive force used during a traffic stop where, after a plaintiff refused orders and moved his hands toward his glove box, officers pulled him from his car, and then, after the plaintiff disobeyed two commands to keep his hands on the hood of the vehicle and failed to remain still during a pat down, an officer twisted plaintiff's arm to handcuff him). These courts approved the use of substantially less force on arrestees who were offering more resistance than Plaintiff in this case at the time Defendant punched and pepper sprayed him. Moreover, at the time of the use of force, Plaintiff was not

resisting in any manner and was permitting Defendant to handcuff him.  Thus, these cases do not support Defendant's position here.

Defendant cites two cases from within this district for the proposition that "[t]he use of pepper spray in effectuating an arrest has also repeatedly been found, in like circumstances, to be objectively reasonable under the law."  (Def.'s Br. at 16).  An examination of the cases reveals that neither excuses Defendant's behavior.  In a suit brought by the parents of a man who died while in police custody, *Davis v. Twp. of Paulsboro*, 421 F. Supp. 2d 835, 854-855 (D.N.J. 2006), the court found that the use of pepper spray on the son at the time of his arrest did not constitute excessive force because the he was

> visibly agitated, acting aggressively, and yelling profanities. [Plaintiffs' son] banged the walls in his house and shoved [an officer] three times before [that officer] used one spray of pepper spray on [plaintiffs' son]. Before resorting to the pepper spray, [the officer] told [plaintiffs' son] to relax or if he did not, he would be arrested. [Plaintiffs' son] responded by swinging his arms and yelling 'I aint [sic] going nowhere. Get the fuck off me.' Moreover, [p]laintiffs do not allege nor do we find any facts in the record establishing that [their son] suffered any lasting injury from the spray. Given these circumstances, we conclude that [plaintiffs' son] posed an immediate threat to [the officer] and possibly others in the house, therefore spraying [him] once with pepper spray was objectively reasonable.

Even more distinguishable is *Tofano v. Reidel*, 61 F.Supp. 2d 289, 305-06 (D.N.J. 1999), in which the court found that no excessive force had been used against a man who, among other acts, slashed an officer's neck with a handcuff.

Here, Defendant has failed to demonstrate any active or passive resistance, violence, aggression, or urgent circumstance that would in any way make Defendant's conduct objectively reasonable.  Accordingly, this Court again finds that a reasonable jury could conclude, and in fact did, that Colaner used excessive force against Plaintiff in violation of his Fourth Amendment rights.  The Court must now determine whether Colaner violated a clearly established right; if so, he cannot succeed on qualified immunity.

**b. Prong Two: Clearly Established Right**

Defendant argues that, even if this Court again finds that a reasonable jury could have found that he had used excessive force under the Fourth Amendment, he is still entitled to qualified immunity because the fact that his conduct constituted excessive force was not 'clearly established' at the time of the incident. (Def.'s Br. at 16-17, 22).  Defendant also argues against his conduct being 'clearly established' as excessive force by asserting that the Attorney General's Policy, by which Trooper Colaner was trained, "includes wrestling a resisting subject to the ground as an example of the force that *may* be 'necessary to overcome a subject's physical resistance to the exertion of the law enforcement's authority."  (Def.'s Br. at 22-23) (citing *Wade*, 2010 U.S. Dist LEXIS 36210).

A right is 'clearly established' if "it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted."  *Curley*, 499 F.3d at 207.  A court determining whether a constitutional right is clearly established does not examine excessiveness under objective standards of reasonableness.  Instead, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Saucier v. Katz*, 533 U.S. at 201-02.

As this Court pointed out in *Wade*, 2010 U.S. Dist LEXIS 36210 at *32, "Plaintiff's claim can only survive the second step of the qualified immunity analysis if, given his version of events, there is no room for reasonable disagreement among reasonable troopers as to the lawfulness of Colaner's actions."  Thus, for example, in *Brosseau v. Haugen*, 543 U.S. 194, 199-201 (2004), the Supreme Court found that although shooting a fleeing suspect may constitute excessive force, the officers who did so were entitled to qualified immunity because the conduct

was not clearly established to be a violation of the Fourth Amendment, as evidenced by varying responses to similar fact patterns by the courts at that time. *See, e.g., Istvanik v. Rosen*, 50 Fed. Appx. 533, 536-37  (3d Cir. 2002) (affirming a district court's post-trial entry of judgment in favor of a police officer, who was found by a jury to have used excessive force by over-tightening the handcuffs of a jailed arrestee, because, "at the time of the incident, the question of whether tight handcuffing constitutes a violation of Fourth Amendment rights . . . was not established even in a general sense."); *Leveto v. Lapina*, 258 F.3d 156, 166 (3d Cir. 2001) (finding, despite facial viability of claims against Internal Revenue Service for alleged pat-downs, lengthy detentions, and closure of business in violation of the Fourth Amendment, the officers were entitled to qualified immunity because the law was not clearly established at the time).

In 2006, the Third Circuit fleshed out its standards for qualified immunity in *Couden*, 446 F.3d at 495.

> A grant of qualified immunity may be upheld where a challenged police action presents an unusual legal question or 'where there is 'at least some significant authority' that lends support' to the conduct in question, even if the conduct was unconstitutional. 'On the other hand, the plaintiff need not show that there is a prior decision that is factually identical to the case at hand in order to establish that a right was clearly established.'

The *Couden* court found that reasonable police officers would not have jumped on a14-year-old boy, put a knee in his back, pointed guns at his head, handcuffed him, and sprayed him with mace on suspicion of burglary, where the police had no reason to believe the boy was violent and there were four officers to control the boy.  *Id. at 497*.  In coming to this conclusion, the court reasoned:

> [T]he constitutional right in question was clearly established under the qualified immunity test. The factors relevant to the excessive force analysis are well-recognized . . . *See Sharrar*, 128 F.3d at 822; cf. *Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005*)* (noting that a 'reasonable officer would be guided

> by the *Sharrar* factors in determining whether to use overwhelming force in a given situation,' and that 'if an officer applies the *Sharrar* analysis in an unreasonable manner, he is not entitled to qualified immunity')).  In this case, most of these factors – including the potential threat posed by the suspect, whether the suspect was resisting arrest, armed, or attempting to flee, and the ratio of officers to suspects – clearly suggested the use of a low level of force.

*Id.*; *see also Green v. N.J. State Police*, 246 Fed. Appx. 158, 162 (3d. Cir. 2007) (recognizing that "[i]n the context of excessive force claims, we have relied on the factors set forth in *Graham* and *Sharrar* in evaluating whether an officer made a reasonable mistake. We have stated that these factors 'are well-recognized,' and that when an officer applies them in 'an unreasonable manner, he is not entitled to qualified immunity.'").

Based on this standard, the Court finds that Defendant has not met his burden of showing the violation of a clearly established right.  First, as the *Couden* court explained, a prior decision of a court that is factually identical is not needed for a right to be considered 'clearly established.'   Rather, because the factors listed in *Sharrar* and *Estate of Smith* are 'well-recognized,' an officer is not entitled to qualified immunity if his use of force, evaluated by a weighing of those factors, was unreasonable.  *See Wade*, 2010 U.S. Dist LEXIS 36210 at *34-35 (citing *Green*, 246 Fed. Appx. at 162-63) (citations omitted).  Thus, this Court, in *Wade* at *35, denied summary judgment on the following basis, which remains valid post trial:

> No reasonable application of the *Graham* and *Sharrar* factors could justify Colaner's use of force under the circumstances here. The mere fact that Plaintiff was under arrest, coupled with the fact that the use of force was brief, and the fact that Plaintiff had his weapon holstered on his ankle are not enough for Colaner to have reasonably thought it was lawful to strike Plaintiff on the back of the head and administer pepper spray because Plaintiff, though subdued, refused to lie on the ground. There is no room for reasonable legal mistake about the matter.

Indeed, unlike the defendants in *Brosseau* and *Istvanik*, Defendant has also failed to show that there is conflict in the courts about the reasonableness of the force he used on Plaintiff.

Second, the Attorney General's Policy does not shield Defendant.  The Policy permits officers to use force only to: (1) overcome resistance; (2) to protect the officer or a third party from unlawful force; (3) to protect property; or (4) to effect other lawful objectives, such as to make an arrest.  Despite Colaner's frequent description of Plaintiff as someone who was resisting arrest, the videotape, Colaner's own testimony where he said Plaintiff was only "minimally" resisting, and the state court acquittal of Plaintiff on the charge of resisting arrest, provide adequate evidence that Colaner was neither overcoming resistance nor using proper force to arrest Wade.  Defendant's noncompliance with the Policy cannot make his 'reliance' on that same policy reasonable.

At this point, Plaintiff has already met his burden to overcome a motion for judgment as a matter of law.  However, the evidence adduced at trial supports Plaintiff's position that the actions of Colaner during and following the arrest suggest that Colaner knew that his conduct had violated a 'clearly established' right.  First, despite Wade's acquittal on the resisting arrest charges filed by Colaner, Colaner continued to claim that Wade resisted arrest by hiding his arm under his body. (Video at 09:10:52-09:11:17; 4/21/10 Tr. 173:9-20, 175:13-16).  The jury viewed that video of the incident, which showed Wade lying on the ground with his arms behind his back for several seconds before Colaner repeatedly told Wade to "stop resisting," (*see* Video at 9:11:00-9:11:04), and the jury also heard Colaner admit that he "didn't tell him until four seconds after his arm was out from behind his body . . . to stop resisting[.]"  (4/21/10 Tr. at 173:20-175:3).

Indeed, following the arrest, the jury heard testimony that Colaner failed to note his striking of Plaintiff in his Use of Force Report.  (*Id.* at 98, 176-178).  In his investigative report, which he filed after he watched the video of the incident, Colaner wrote, "I not only stood my

ground but pressed forward to achieve a lawful objective [–] overcoming [Defendant's] physical resistance." (*Id.* at 181).   Additionally, the jury also heard testimony that Defendant struck Plaintiff with his pepper spray canister in his closed hand.   The jury was entitled to weigh the credibility of Colaner, particularly as judged against the facts as depicted in the video.

As the Supreme Court has recognized, the "jury's authority [is] to assess the credibility of witnesses, resolve genuine issues of fact, and make the ultimate determination[.]"   *See Tellabs, Inc. v. Makor issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007); *see also Kansas v. Ventris*, 129 S.Ct 1841, 1847 (2009) (recognizing that "[o]ur legal system . . . is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses"); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 624-25 (1991) (stating that when a party "invoke[s] its Seventh Amendment right, the jury becomes the principal factfinder, charged with weighing the evidence, judging the credibility of witnesses, and reaching a verdict[,] . . . [and these] factual determinations as a general rule are final").   Prior to the jury trial, this Court had already found on a motion for summary judgment that there were sufficient facts for a jury to find that Defendant had used excessive force on Plaintiff.   Nothing occurred during the trial to strengthen Defendant's assertions.   Clearly, as explained above, the jury had sufficient evidence from which to conclude that Colaner had used excessive force.

**ii. Excessiveness Decided by Jury**

Defendant dedicates a paragraph in his briefing to argue that "the Court erred in finding the question of excessiveness to be a factual one for the jury, rather than a legal one for the court."   (Def.'s Br. at 12).   Defendant appears to be trying to relitigate summary judgment, wherein this Court decided that, viewing the facts in the light depicted by the videotape consistent with *Scott v. Harris*, 550 U.S., 380 (2007), it was Defendant's version of the events

that was contradicted by the videotape. *Wade*, 2010 U.S. Dist LEXIS 36210 at *27-*28. This Court further found that "[a] jury could indeed view the videotape and find consistent with Plaintiff's version of events that Colaner's conduct in striking Plaintiff on the back of the head and using the pepper spray after Plaintiff had already been partially restrained and appeared compliant was not objectively reasonable." *Id.* at *28.

The Court did not find that Defendant's conduct was objectively reasonable under the circumstances at the summary judgment stage. Thus, it was appropriate for excessiveness to be a question of fact for the jury. *See Abraham v. Raso*, 183 F.3d 279, 290 (3d. Cir. 1999) (agreeing with the Ninth Circuit that "even though reasonableness traditionally is a question of fact for the jury, defendants can still win on summary judgment…") (citations omitted); *see also Armstrong v. Sherman*, No. 09-716, 2010 WL 2483911, *4 (D.N.J. June 4, 2010) ("[S]ince there is no clearly-defined rule for determining reasonableness, excessive force claims will frequently raise a question of fact for a jury") (citing *Abraham*, 183 F.3d at 290).

### iii. State Court Findings

Defendant claims that the result in this case, as well as the Court's finding on summary judgment that Defendant's "use of blunt force and pepper spray served no purpose other than to inflict discomfort and pain," *Wade* at *34, is irreconcilable with express findings made against Plaintiff in state court proceedings." (Def's Br. at 18). Defendant made this argument in his motion to dismiss, and the Court disagreed, stating that "the fact that Plaintiff was acquitted of resisting arrest militates against [*Heck v. Humphrey*, 512 U.S. 477 (1994)] barring Plaintiff's excessive force claim." (Doc. No. 40 at 16). If Plaintiff had been convicted in the state court of resisting arrest at the time Defendant used force to effectuate his arrest, this Court could not have

based its finding that Defendant used excessive force on Plaintiff's lack of resistance.[8]  *See*

*Gilles v. Davis*, 538 F. Supp. 2d 785, 789 (D.N.J. 2008) ("Under *Heck*, a § 1983 action that

impugns the validity of the plaintiff's underlying conviction cannot be maintained unless the

conviction has been reversed on direct appeal or impaired by collateral proceedings.").

However, Plaintiff was only convicted of careless driving and obstruction in state court.

As a result, Plaintiff is correct when he states that "the jury [did not need to] find any facts in

conflict with those findings in order to return a verdict of excessive force." (Pl.'s's Br. at 18).  It

is axiomatic that merely having probable cause to arrest or charge someone with obstruction does

not give a police officer carte blanche to use unlimited force.  Additionally, as the jury heard, by

the time Wade had one handcuff on and was compliantly waiting for Colaner to finish

handcuffing him, only to be struck in the back of his head by Colaner, Wade was no longer

obstructing.  He had already provided Colaner with his information, including the location of his

gun and the fact that he was a police officer.  (4/19/10 Tr. at 57:10-25).  Moreover, as Plaintiff

points out, none of the state court findings listed by Defendant are actually in conflict with the

facts supporting the jury's verdict.

> No court has found that Wade did not tell Colaner that he would let Colaner
> handcuff him.  No court found that Colaner did not punch Wade in the back of the
> head and did not pepper spray him.  No court found that Wade did not have one
> hand handcuffed and submissively put the other behind his back waiting to be
> handcuffed.  No court found that Wade attempted to retrieve his weapon or

---

[8]     Indeed, this Court, in *Hendrix v. City of Trenton*, No. 06-3942, 2009 U.S. Dist. LEXIS
120718, at *24-30 (D.N.J. Dec. 29, 2009), construing Third Circuit precedent, explained that
there are circumstances where despite a plaintiff having physically provoked an officer first,
because the plaintiff was no longer a threat to that officer's safety, the officer's assaultive
behavior would be deemed excessive or gratuitous.  In other words, at the time the officer had
applied unreasonable or excessive force, the plaintiff was already subdued by the officer.  *Id.* at
*24; *see Nelson v. Jashurek*, 109 F.3d 142, 145-46 (3d Cir. 1997); *Green v. New Jersey State
Police*, 246 Fed. Appx. 158, 162 n. 8 (3d Cir. 2007); *Lora-Pena v. FBI*, 529 F.3d 503, 505-06
(3d Cir. 2008).**Error! Main Document Only.***Error! Main Document Only.*

threatened Colaner.  Thus, there is no inconsistency between the facts supporting the jury's verdict and the facts found by the state courts.

(Pl.'s Br. at 19).

Finally, because the issue of excessive force was never before the State court, and Plaintiff was acquitted of resisting arrest, it cannot be said that the State court proceedings embraced the question of whether Colaner used an appropriate amount of force.  Thus, Colaner's argument that the jury verdict contradicts the state court's findings is unconvincing and unavailing.

### iv. Submission of Punitive Damages to Jury

Lastly, Defendant argues that the issue of punitive damages should not have been submitted to the jury because the evidence cannot support a rational finding that Defendant acted with reckless or callous disregard of Plaintiff's rights.  (Def.'s Br. at 24).  Punitive damages are designed to "represent a limited remedy, to be reserved for special circumstances," *Savarese v. Agriss*, 883 F.2d 1194, 1205 (3d. Cir. 1989), "in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief." *Keenan v. City of Phila.*, 983 F.2d 459, 470 (3d Cir. 1992).  Generally, "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). Specifically, punitive damages are available in Section 1983 cases where a defendant has acted with a "reckless or callous disregard of, or indifference to, the rights and safety of others." *Mitchell v. City of Phila.*, 344 Fed. Appx. 775, 780 (3d Cir. 2009) (quoting *Keenan*, 983 F.2d at 469-70).  Where there is no evidence that a defendant acted with the requisite bad intent, the issue should not be submitted to the jury.  *See Kolstad v. ADA*, 527 U.S. 526, 538-39 (1999)

30

("W]here there is no evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice, the trial court need not, and indeed should not, submit the issue of punitive damages to the jury") (citation omitted).

Plaintiff, in opposition, correctly claims that by not mentioning punitive damages in his pre-verdict motion for judgment as a matter of law, Defendant did not preserve the issue for this Rule 50(b) motion. As the Third Circuit noted in *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1173 (3d Cir. 1993), a post-trial "motion for judgment as a matter of law pursuant to Rule 50(b) must be preceded by a Rule 50(a) motion sufficiently specific to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient." Colaner's pre-verdict motion for judgment as a matter of law did not address punitive damages, and when Colaner's counsel made the request, counsel stated that, "[w]ith regard to [Colaner], we merely repeat the arguments from our qualified immunity in light of the evidence in this trial, your Honor." (*See* 4/22/10 Tr. at 137). This was in reference to Defendant's earlier summary judgment motion, which the Court denied in *Wade*, 2010 U.S. Dist LEXIS 36210. Colaner made no mention of punitive damages in his moving or reply brief in that action. (*See* Dkt. 77-1; Dkt. 86). Therefore, by failing to specify that he was also moving for pre-verdict judgment as a matter of a law on the issue of punitive damages, Defendant waived his right to raise this argument post-verdict. *See Williams v. Runyon*, 130 F.3d 568, 571-72 (3d. Cir. 1997) (citations omitted).

Additionally, evidence introduced at trial lends sufficient support to the jury's ability to consider awarding punitive damages. The jury repeatedly saw the video of the incident, which depicts Defendant violently striking Plaintiff in the back of the head, and then, after wrestling him to the ground, administering pepper spray to the back of Plaintiff's head. The jury also

heard testimony regarding Defendant's failure to comply with the Attorney's General's Policy regarding use of force.  (4/21/10 Tr. at 176-180).  Further, Plaintiff's expert, Williams, testified that the act of striking a person in the base of the head with a closed fist, with an object in the fist to strengthen it, indicates that the strike was intended as a punitive measure to cause pain, rather than for a legitimate law enforcement purpose.  (*See* 4/20/10 Tr. at 41:17-42:21; 43:12-44:3).  Since the Court finds there was sufficient evidence to give rise to the jury's inference of actual malice, it was therefore proper to submit punitive damages to the jury.

Defendant's motion for judgment as a matter of law is denied.

## III. DEFENDANT'S MOTION FOR A NEW TRIAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59

### A. Standard of Review

Federal Rule of Civil Procedure Rule 59(a) provides, in relevant part, that:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States….

*See* FED. R. CIV. P. 59(a).  In the past, courts have been permitted to grant new trials under several circumstances, including when "the verdict is against the clear weight of the evidence; damages are excessive; the trial was unfair; and [when] substantial errors were made in the admission or rejection of evidence or the giving or refusal of instructions. . ."  *Lyles v. Flagship Resort Development Corp.*, 371 F. Supp. 2d 597, 602 (D.N.J. 2005) (quoting *Lightning Lube, Inc., v. Witco Corp.*, 802 F. Supp. 1180, 1186 (D.N.J. 1992)) (*aff'd*, 4 F.3d 1153 (3d Cir. 1993)); *Matos v. City of Camden*, No. 06-205 (NLH), 2010 WL 3199928, *1 (D.N.J. Aug. 12, 2010).   In the absence of a finding that not granting a new trial would sanction a miscarriage of justice, the judge must respect the jury's verdict.  *See Levine*, 2010 WL 2735303 at *3 (citing *Shanno v.*

*Magee Indus. Enters., Inc.*, 856 F.2d 562, 567 (3d Cir. 1988); *see also Lyles*, 371 F. Supp. 2d at 601-02 (citing *Roebuck v. Drexel University*, 852 F.2d 715, 736 (3d Cir. 1988)) (citing another source). "A trial court may not grant a new trial because it would have come to a different conclusion than that reached by the jury." *Id.* (citing *Lightning Lube, Inc.,* 802 F.Supp. at 1186).

"A district court has broad latitude to order a new trial for prejudicial errors of law." *Matos*, 2010 WL 3199928, at *1 (citing *Klein v. Hollings,* 992 F.2d 1285, 1289-90 (3d Cir. 1993)). "In evaluating a motion for a new trial on the basis of trial error, the court must first determine whether an error was made in the course of the trial and then decide whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." *Id.* (quotations omitted). "By contrast, a court's discretion to order a new trial for a verdict contrary to the weight of the evidence is more limited." *Id.* (quoting *Paolella v. Browning-Ferris, Inc.*, 973 F.Supp. 508, 511 (E.D.Pa 1997)). A court may not grant a new trial simply because it would have reached a different verdict. *Id.* Rather, "new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Greenleaf v. Garlock, Inc.*, 174 F.2d 352, 366 (3d Cir. 1999) (quotations omitted).

## B. Discussion

Defendant argues that a new trial is required. Defendant contends that the jury pre-judged the issue of punitive damages, and acted out of passion, rather than reason, in making its decision. Defendant also alleges seven trial errors that he argues entitle him to a new trial. For the reasons set forth below, Defendant's motion is denied in all respects.

**1. The Jury's Decision Regarding Punitive Damages**

Defendant now argues that the jury, by twice handing down a punitive verdict that "it well knew [Colaner] could not possibly pay[,]" either acted "irrational[ly]" or, if under the belief that Colaner would be indemnified, "acted on a patently improper consideration." (Def.'s Br. at 28).  Defendant contends that "[t]his is clearly a case in which the jury lost track of the constraining principles that govern punitive damage awards, and became enthralled with its own power."  (Def.'s Br.  at 30).  In reply, Plaintiff asserts that Colaner has presented no evidence of either passion or prejudice on the part of the jury.  The Court agrees with Plaintiff.

The Third Circuit has repeatedly stated that "[a] new trial is warranted only upon the showing that the verdict amounted from passion or prejudice, and yet the size of the award alone [is not] enough to prove prejudice and passion."  *See Bianchi v. City of Philadelphia*, 80 Fed. Appx. 232, 237 (3d Cir. 2003) (citing *Evans v. Port Authority of N.Y. and N.J.*, 273 F.3d 346, 352 (3d Cir. 2001)) (quoting *Dunn v. Hovic*, 1 F.3d 1371, 1383 (3d Cir. 1992)); *see also Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 114 (3d. Cir. 1999), *cert. denied*, 528 U.S. 1074 (2000) (citing *Dunn*, 1 F.3d at 1383).  Colaner has only pointed to three possible instances which evidence his assertion that the jury acted out of passion or prejudice: (1) the jury's premature attempt to award punitive damages; (2) the jury's question regarding the source of payment if Defendant was ordered to pay punitive damages; and (3) a sermon, posted on the internet by juror Jeffrey Eaton ("Eaton"), in which Eaton discussed his experience serving on the jury and mentioned that Plaintiff had lost his job following the incident with Defendant.  None of these pieces of evidence support a finding of passion or prejudice.

First, Defendant has failed to explain how a premature award of punitive damages, which the jury reduced by $3,000,000 after hearing additional testimony and instructions, evidences passion or prejudice.  As this Court explained when Defendant objected to the re-submission of the punitive damages issue to the jury:

> When you say [the jury has] been inflamed, they've heard nothing other than the facts, as to whether making a determination that it was malicious and wanton, in coming into their determination the only new thing they will be instructed upon is they may consider -- and, by the way, the instruction reads they 'do not have to, but they may consider the assets of the defendant,' and the rest of the instruction in calculating says exactly what the original charge said as well:

> In determining whether a finding of [punitive damages] is appropriate in considering, will it deter others? Will it deter this defendant and is it punishing?

(4/23/10 Tr. at 83-84) (internal quotation marks omitted).  Defendant has failed to convince the Court that this mistake on the jury's part demonstrates passion or prejudice in its later award of a smaller amount of punitive damages.

Second, the jury's decision to send a note to the Court asking whether, in the event punitive damages were awarded, Colaner would be the only source of the funds, does not evidence passion or prejudice.  The Court provided an answer, instructing the jury to "consider only the evidence presented in this case and not whether there is an additional source to pay the punitive award."  Defendant assented to, and did not object to the Court's answer, and in his moving brief admits it was right for the Court to instruct the jury "to consider only the evidence that had been presented."  (Def.'s Br. at 28).  Defendant has presented no evidence, other than the size of the verdict, that this question supports a finding of prejudice or passion.[9]

---

[9]     Defendant contends that the instruction "[i]f you find it more likely than not that [Colaner] acted maliciously or wantonly in violating Gary Wade's federal rights, then you may award punitive damages against [Colaner]" (4/23/10 Tr. at 29) implored the jury to calculate punitive damages and "may even have implied, unintentionally, that Trooper Colaner had, in fact, violated plaintiff's rights."  (Def.'s Br. at 27).  Because Defendant did not object to the

Lastly, Defendant argues that proof of prejudice or passion can be found in a sermon that was posted on the internet several weeks *after* the conclusion of the trial by juror Eaton.  (*See* Doc. No. 124, Keoskey Cert., Ex. A).  According to Defendant, this sermon "provides objective evidence that the jury's award encompassed issues and considerations that should have played no part in its deliberation."   (Def.'s Reply Br. at 14).   However, Eaton's sermon only once references a fact that should not have been considered in making an award.  In first describing the case he was impaneled to serve on, Eaton stated, "[Plaintiff] would ultimately be acquitted of the charge of resisting arrest, but in the end he lost his job with the Tinton Falls police."  (*See Id.*).  After a sermon in which Eaton spoke about the Bible, criticized the "Tea Party Movement," and described the "spirit of democracy," Eaton concluded his sermon by explaining, "[w]e on the jury found [Colaner] guilty of using excessive force and awarded damages to [Plaintiff].  It was a certain kind of love in a world of less than perfect creatures.  Amen."  (*See Id.*).  There is nothing in Mr. Eaton's sermon to suggest that the award of punitive damages was supported by prejudice or passion.  If anything, by referencing "a world of less than perfect creatures[,]" Mr. Eaton reinforces this Court's belief that the jury awarded punitive damages because it believed Defendant acted with reckless or callous disregard for Plaintiff's rights.

---

language, those instructions are subject to review only for plain error.  *See* Fed. R. Civ P. 51.  There is no error, let alone plain error, in those instructions.  (*Compare* 4/23/10 Tr. at 28-31 *with* Third Circuit Model Civil Jury Instructions, § 4.8.3 (Section 1983 – Damages – Punitive Damages)).  Additionally, Defendant cannot successfully argue that the jury was prejudiced on the basis that, when it deliberated on the jury verdict form for the first time, it was unaware of Defendant's financial status.  *See Keenan*, 983 F.2d at 472 n.12 (citing *Bennis v. Gable*, 823 F.2d 723, 734 n. 14 (3d Cir. 1987)) ("We reject the defendants' contention that evidence of their financial status was a prerequisite to the imposition of punitive damages.").  Even if this decision was in error, the Court subsequently rectified it by permitting Defendant to testify regarding his net worth, and instructing the jury that it was permitted to consider that testimony in calculating damages.  (*See* 4/23/10 Tr.  at 88-90).

Accordingly, a new trial is not warranted on the basis that the jury's award was tainted by prejudice or passion.

**2. Evidentiary Issues**

Defendant next identifies seven evidentiary errors that he believes deprived him of a fair trial.  The first, third, and fourth alleged evidentiary errors stem from this Court's granting of pre-trial motions *in limine*, which were filed by Plaintiff to bar:  the introduction of any evidence of Plaintiff's convictions for careless driving and obstruction of the administration of law; any testimony from former defendant Chief Turning; and any evidence that, in the eighteen months before the incident in this case, Plaintiff was stopped fourteen other times by police.  (*See* Doc. No. 61-63).  Defendant contends that the Court erred in granting the motions, as well as failing to adjust and correct those rulings at trial when it became evident that modifications were warranted.  Defendant's other four alleged evidentiary errors stem from supposed errors made in the jury instructions, Plaintiff's cross-examination of Defendant, and Plaintiff's expert testimony. The Court is not persuaded that any of these alleged trial errors warrant ordering a new trial and will address each in turn.

**a. The Exclusion of Plaintiff's Convictions for Careless Driving and Obstruction**

Defendant argues that he was deprived of a fair trial as a result of the Court's decision to grant Plaintiff's motion *in limine* to exclude evidence of his criminal convictions for careless driving and obstruction of the administration of law, and that even if the Court concludes that the evidence was properly excluded before the trial began, the Court's failure to reconsider its decision after Plaintiff made "repeated tactical use of his acquittal on [the resisting arrest] charge" was in error.  (Def.'s Br. at 43).  Defendant contends that the jury "was entitled to know

. . . that plaintiff's non-cooperative conduct, as a matter of law, had been determined to constitute a criminal offense[,]" and because they did not know of his convictions, the jury returned a verdict "flatly inconsistent with the findings made in the state court proceedings." (*Id.*). The Court disagrees. Introduction of Plaintiff's conviction for administration of law under N.J.S.A. 2C:29-1 is barred by FED. R. EVID. 609(a)-(b) because it is neither a crime punishable by a term of imprisonment in excess of one year, N.J.S.A. 2C:43-8, nor a crime involving dishonesty or false statement.

Nevertheless, Defendant relies on a series of unpersuasive cases. *See United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361-362 (1984) (finding criminal acquittal of firearms charges did not preclude subsequent forfeiture action because of different burdens of proof in criminal and civil actions); *Wheeler v. Nieves*, 762 F. Supp. 617, 625 (D.N.J. 1991) (holding that plaintiff in civil action was collaterally estopped by findings in previous criminal action where "the wrongs alleged by [plaintiff] in the . . . civil action were also at issue in the prior criminal proceedings"). Defendant primarily relies upon *Nelson v. Jashurek*, 109 F.3d 142 (3d Cir. 1997), in which the Third Circuit remanded an excessive force case in circumstances where the plaintiff, unlike here, had been convicted in state court of resisting arrest. The *Nelson* court found that, in the event the case reached trial, "the trier of fact must be aware that [defendant] was justified in using 'substantial force' in arresting [plaintiff][,]" because there was a danger that the jury would "base its verdict on findings not consistent with the conclusion the jury reached in the criminal case." *Id. at 146*.

At the outset, the Court notes that it has already ruled that the jury's finding did not conflict with any findings in the state court proceedings. Additionally, the Court finds Defendant's cited cases unavailing. *One Assortment* dealt with the issue of whether the

government, after having failed in a criminal suit, was collaterally estopped from bringing a civil forfeiture action.  It has no relevance to the case at hand.  *Wheeler* is unhelpful because no finding regarding excessive force was entered by the state court here.  Lastly, this case is entirely inapposite of *Nelson*, as the *Nelson* court based its decision on the fact that the plaintiff had been convicted of resisting arrest in state court.  Thus, in *Nelson*, it was important that the jury knew that the officer was justified in using reasonable force to arrest the resisting plaintiff.

Here, however, Plaintiff was not only acquitted of resisting arrest, but there was sufficient evidence for the jury to find that he was no longer obstructing at the time Defendant employed force, including Colaner's own admission that he ""believe[d] [Plaintiff] was offering minimal resistance." (4/21/10 Tr. at 103:8-9).   As Plaintiff argues, "[t]he reasonableness of the use of force is assessed against the backdrop of the circumstances presented from the point of view of the officer.  At the time Colaner punched and sprayed Wade, he did not [and] could not know whether Wade would ultimately be convicted; all he knew was the underlying facts." (Pl.'s Br. at 43).  As will be explained below, the underlying facts, such as Plaintiff having been pulled over for speeding and his untimely responses to Defendant's questions about whether he was a police officer, were not disputed at trial.  Thus, Plaintiff's convictions for careless driving and obstruction were irrelevant and there was no error in excluding this evidence.

**b. Failure to Later Permit Introduction of Plaintiff's Convictions**

Defendant argues that the doctrines of "opening the door" and "completeness" should have led to the admission of Plaintiff's convictions into evidence during the trial.  The Court disagrees.

The "opening the door" doctrine, sometimes referred to as curative admissibility, "provides that once a party introduces inadmissible evidence, the opposing party may introduce

otherwise inadmissible evidence to rebut or explain the first offering."  *See U.S. v. Chinnery*, 68 Fed. Appx. 360, 366 (3d Cir. 2003) (holding that "[a]s the government does not argue that [a government witness's] testimony on cross-examination was inadmissible, the doctrine of curative admissibility is inapplicable.") (citing *Government of Virgin Islands v. Archibald*, 987 F.2d 180, 187 (3d Cir. 1993)).  Other courts have found that the doctrine also allows admission of otherwise inadmissible evidence to contradict testimony of parties who are attempting to mislead the trier of fact.  *See United States v. Antonakeas*, 255 F.3d 714, 724-725 (9th Cir. 2001) (holding that defendant, by denying any involvement in drugs, opened the door to rebuttal testimony that he sold drugs in the past); *United States v. Bailleaux*, 685 F.2d 1105, 1110 (9th Cir. 1982) (finding that defendant, by testifying that he had previously confessed to crimes he was convicted of in another state, allowed the government on cross-examination to introduce evidence of underlying facts of that conviction to rebut inference of innocence).

The doctrine of completeness is a related evidentiary doctrine that "states that a witness may be questioned as to the basis, motive, or reasons for an opinion, elicited on cross-examination."  *Chinnery*, 68 Fed. Appx. at 367 (citing *Archibald*, 987 F.2d at 187-88) ("When a witness testifies on cross-examination as to part of a conversation, statement, transaction or occurrence, the principle of completeness allows the party calling the witness to elicit on redirect examination 'the whole thereof, to the extent it relates to the same subject matter and concerns the specific matter opened up.'") (citations omitted).  The doctrine of completeness is codified in FED. R. EVID. 106, which provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."  *U.S. v. Evans*, 356 Fed. Appx. 580, 583 (3d Cir. 2009).  This

codification "guards against the potential for evidence to be misleading when presented out of context. Admission of additional evidence is compelled 'if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding.'" *Id.* (quoting *United States v. Soures*, 736 F.2d 87, 91 (3d Cir. 1984)).

Here, Defendant stipulated to the fact that Wade was acquitted of the resisting arrest charge filed against him.  (Doc. No. 83, Stipulated Fact D).   During trial, Plaintiff did not introduce any inadmissible evidence himself, nor did he testify in any way that would have led the jury to believe he had been acquitted of anything but the resisting arrest charges.  In fact, if any statement was made during the trial that conflicted with findings made in state court, it was Defendant's assertion that Wade had resisted arrest despite his stipulation that Plaintiff was acquitted of that charge.  (4/21/10 Tr. at 172-173).   Further, Defendant distorts the record by claiming that Plaintiff testified contrary to his conviction for careless driving by stating at trial that Defendant "had no reason to pull me over. I didn't do anything[,]" and thus Defendant should have been permitted to reference that conviction.  (Def.'s Reply Br. at 15).  However, an examination of the record reveals that Plaintiff, in response to a question about Plaintiff's *actual response* at the time he was pulled over, stated "I'm upset, and I'm asking him that I want a supervisor out at the scene, and he had no reason to pull me over. I didn't do anything." (4/19/10 Tr. at 52:5-8).   The other instances referenced by Defendant – namely Plaintiff's counsel's references to Plaintiff's acquittal on resisting arrest charges during his opening statement, closing statement, and cross-examination of Colaner – neither opened the door to introduction of his convictions nor required that they be introduced to give the jury the complete picture.  (*See* 4/19/10 Tr. at 27; 4/21/10 Tr. at 175; 4/23/10 Tr. at 85).

**c. Exclusion of Chief Turning's Testimony**

In the Proposed Pretrial Order and Final Pretrial Order, Defendant listed Chief Turning, who had been Chief of Police for the Borough of Tinton Falls, as a liability witness, stating that Turning "has knowledge regarding Plaintiff's employment with the Tinton Falls Police Department, his arrest, and ultimate suspension[,] [and] will testify as to the Plaintiff's demeanor, attitude and general behavior as a police officer, to include his various discipline and anger issues." (Doc. No. 62-2, Cunniff Cert., Ex. A. at 11; Doc. No. 83 at 14). Plaintiff filed a motion *in limine* to exclude Turning's testimony, arguing Turning's testimony should be barred: (1) pursuant to FED. R. EVID. 404(a)-(b) because it constitutes an improper attempt to use Wade's alleged character and prior acts to prove conduct in conformity therewith; (2) pursuant to FED R. EVID. 402 as irrelevant; and (3) pursuant to FED R. EVID. 403 because its prejudicial effect would substantially outweigh its probative value. (Doc. No. 62-3 at 2). At a motion hearing on March 19, 2010, this Court granted the motion to exclude Turning's testimony. (Doc. No. 87). Defendant now argues that this Court, "in barring [D]efendant from calling [Turning], failed to give any consideration to his status as a named defendant, and wrongly allowed plaintiff to argue that the testimony of an individual he had himself chosen to sue was irrelevant." (Def.'s Br. at 47). Defendant also claims that, had Turning been called, he would have "offer[ed] testimony regarding [P]laintiff's medical condition prior to the stop, and to refute [P]laintiff's claims that he now suffers from psychological problems . . . that stem from [Colaner's] actions." (*Id.*).

The Court finds Defendant's argument unavailing for the same reasons stated by this Court in granting Plaintiff's motion *in limine*. FED. R. EVID. 404(a) and 404(b) bar Turning's testimony because it is an attempt by Defendant to use Wade's character and alleged prior acts to prove conduct in conformity therewith during the traffic stop. (*See* Doc. No. 89). Moreover,

42

there was no basis for the Court to find that Turning would have testified in the manner suggested by Defendant.  In Turning's sworn June 21, 2007 deposition, he reported that Wade's performance evaluations were all excellent, that Wade was "an excellent officer who performed his duties well, . . . worked very hard[,] . . . [and] was a very good employee."  (Doc. No. 121, Dec. of Schramm, Ex A., Turning Dep 55:9-56:1).  Indeed, while Turning was initially named as a defendant in this suit, the claims asserted against Turning were related to Plaintiff's employment status at the Tinton Falls Police Department after Plaintiff's arrest; the excessive force claims were not asserted against Turning.  In fact, Turning was not present during the incident and had no knowledge of what transpired between Colaner and Wade.  Ultimately, Turning was also dismissed as a defendant.  Accordingly, Turning's testimony was properly excluded.

**d. Exclusion of Evidence of Plaintiff's Previous Vehicle Stops**

Defendant argues that CAD Abstract Reports, which showed that Plaintiff was stopped by police fourteen times in the eighteen months before the traffic stop that gave rise to this action, were "relevant and admissible for numerous permissible purposes," including to show that Plaintiff "had ample knowledge of how properly to conduct himself during a traffic stop . . . [and] was in the habit of disregarding traffic laws." (Def.'s Br. at 48).  Here, where the jury was charged with deciding whether the force used by Defendant was reasonable under the circumstances, such evidence is wholly irrelevant.  *See* FED. R. EVID. 402.  First, introducing evidence of whether Wade was in the "habit" of disregarding traffic laws would constitute an improper attempt to show that his prior alleged bad acts were in conformity therewith in violation of Rule 404(b) of the Federal Rules of Evidence.  *See Spain v. Gallegos*, 26 F.3d 439, 453 (3d Cir. 1994) (finding that evidence may be excluded when its admission is likely to lead to

litigation of collateral issues, thereby creating a side issue which might distract the jury from the main issues).  Second, the state of mind of Plaintiff before and during the traffic stop was similarly immaterial.

Defendant also asserts that this evidence was relevant to refute Plaintiff's claim that he continues to suffer psychological ailments, including nightmares and flashbacks, due to the attack. Defendant contends that had the jury known about Wade's prior stops, they may have found that the flashbacks stemmed from those stops.  This argument is wholly without merit. There is no link between the previous stops and the one at issue.  There is simply no basis upon which to find that the previous stops had any connection whatsoever to Plaintiff's psychological injuries, as there is no indication that any of these stops was anything other than routine stops. Absent some testimony linking the abstracts to Plaintiff's injuries, this evidence of Plaintiff's prior traffic stops was properly excluded.

### e. Plaintiff's Counsel's Cross-Examination of Defendant

Defendant next argues that he is entitled to a new trial because he was questioned on cross-examination as to the veracity of the testimony of Plaintiff's wife, Bonnie Wade. Defendant contends his counsel objected on the grounds that such questioning was argumentative.  However, an examination of the transcript reveals that Defendant's counsel did not object to this question.  He objected to an accusatory half-question asked by Plaintiff's counsel to Defendant, and after the objection was made, did not object again when Plaintiff pursued a less argumentative style of questioning.

> Q:     You hit him in the shoulder.  So you have no explanation why he had a
>        bump on his head?
> A:     He's lying.
> Q:     You believe that he is not telling the truth?
> A:     I absolutely believe he is not telling the truth.

> Q:      Just like all the times you told different stories here, between now and the
>         grand jury, between now and your deposition, between now and –
>
> [Defendant's Counsel]: Objection your Honor, Argumentative.
>
> Q:      Do you also believe Bonnie Wade is not telling the truth when she felt a
>         bump on the back of his head? Do you believe she's making that up?
> A:      He put it there possibly.  She saw him after the event. There is a gap in
>         time there.
> Q:      You believe that he deliberately put a bump on the back of his head to
>         make you look bad?
> A:      I think he is absolutely capable of that, sir.

(4/21/10 Tr. at 167:4-23).  It should also be noted that Plaintiff's counsel questioned Defendant

about the location of the bump in response to Defendant's belligerent outburst, in which he

accused Plaintiff of lying.  In light of Defendant's accusation, which his counsel did not seek to

strike, Plaintiff's counsel was not in error to question whether Defendant also believed Bonnie

Wade, who corroborated her husband's story about the bump, was lying as well.   Indeed,

Colaner opened the door to being questioned about Bonnie's Wade assertions by testifying that,

contrary to Plaintiff's accusations, he actually hit Plaintiff in the shoulder. (*See* 4/21/10 Tr. at

68:23-67:1, 70:2-5).  It was not improper for Plaintiff's counsel to question Colaner about this

fact, and once Colaner directly accused Plaintiff of lying, Plaintiff's counsel was not foreclosed

from seeking clarification from Defendant.

Defendant's reliance on out-of-circuit authority is unconvincing.   In *United States v.*

*Richter*, 826 F.2d 206, 208-209 (2d Cir. 1987), for instance, the court held that a prosecutor's

line of questioning on cross-examination, which compelled the defendant to state that a law

enforcement officer was lying, constituted reversible error because, even though defense counsel

had not objected to the question, there was evidence that the prosecutor had also later misled the

jury.  In *United States v. Sullivan*, 85 F.3d 743, 749-50 (1st Cir. 1996), the court stated that it was

improper for counsel to ask one witness to comment on the veracity of the testimony of another

witness, but declined to state that the "at most, rhetorical points" scored by the government actually affected the outcome of the trial.  More recently, in *United States v. Geston*, 299 F.3d 1130, 1136-37 (9th Cir. 2002), the court held that "it was plain error for the court to allow the prosecutor to persist in asking witnesses to make improper comments upon the testimony of other witnesses," but did so only after determining that the prosecutor's actions "seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would result in a miscarriage of justice."  *Id.* (quoting *United States v. Tanh Huu Lam*, 251 F.3d 852, 862 (9th Cir. 2001)) (citation omitted).  Here, Defendant did not object to the question asked.  Further, Plaintiff's counsel did not "persist" in asking witnesses to comment upon the credibility of other witnesses. The allegedly objectionable questioning of Colaner regarding the testimony of Bonnie Wade was limited and provoked by Colaner's angry accusation that Plaintiff had lied about his injury.  Mrs. Wade testified consistent with her husband.  Obviously, Colaner's accusation called into question not only Plaintiff's testimony, but that of Mrs. Wade, as well. Thus, the exchange was not unduly prejudicial.  The Court finds the cited case law unpersuasive, and finds no plain error in the Court's decision to not exclude the limited line of questioning by Plaintiff's counsel.

**f. Failure to Instruct the Jury on Non-Compensable Issues**

Contrary to Defendants' assertions, Defendant is not entitled to a new trial because the Court did not specifically instruct the jury that Colaner's brandishing of his weapon, Wade's loss of employment, and stress related to the litigation process were not compensable injuries. Before giving jury instructions, this Court specifically noted, "for the record[,] we have spent the last day or so reviewing the jury charges as well as the verdict form," and then asked if either party had any objections before they were submitted to the jury.  (4/23/10 Tr. at 3:7-13).

Defendant raised no objections.  (*Id.* at 3:14).  Defendant made no request that the instructions specifically identify the issues *not* to be considered by the jury in assessing damages.  Thus, Defendant failed to make a timely objection to the jury instructions under FED. R. CIV. P. 51(c), and the Court may only review the instructions for plain error.  *Hailey v. City of Camden*, 631 F. Supp. 2d 528, 540 (D.N.J. 2009) ("[W]here . . . Defendants failed to object to the jury instructions . . . the Court reviews for 'plain error in the instructions affecting substantial rights.'") (citing FED. R. CIV. P. 51(d)(2); *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 339 (3d Cir. 2005)).  When reviewing for plain error, courts will grant "a new trial only if the alleged error is fundamental and highly prejudicial, such that the instructions failed to provide the jury with adequate guidance and our refusal to consider the issue would result in a miscarriage of justice."  *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 136 (3d Cir. 1997) (citing *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 53 (3d Cir. 1989)).  The Court fails to find plain error in the instructions.

The jury was specifically instructed that its duty was to decide if Colaner's use of pepper spray and/or his decision to strike Plaintiff in the head constituted excessive force, and if so, they would have to calculate compensatory damages by considering only injuries alleged by Plaintiff, which the Court described in detail.  (4/23/10 Tr. at 25-27).  Thus, the Court explicitly instructed the jury as to the only actions which it could consider in reaching its decision.  Indeed, the Court is not obligated to mention every conceivable fact that the jurors should not consider as opposed to instructing them as to what they may consider.  During the entirety of Plaintiff's counsel's summation, he did not mention any non-compensable factors.  For example, Plaintiff's counsel, when arguing for compensatory damages, stated:

> The next question you are going to have to decide is damages. This is a tricky
> question. It's hard to put a number on physical health. It's even harder to put a

number on your mental health. You have to decide what it's worth not to spend your life on high alert, anxious and afraid you are going to be attacked. What's it worth not to have nightmares and flashbacks? What's it worth not to have trouble sleeping and eating? What's it worth not to have headaches? What's it worth not to be afraid to drive long distances and drive on state highways? What's it's worth not to be afraid and get that pit in your stomach, we all know what that feeling is, and have trouble breathing every time you see the state police? What's it's worth not to think about it every day? What's it worth not to be withdrawn from your friends and not to enjoy life?

(*Id.* at 66:15-67:6).  The argument for damages revolved around the specific emotional harm suffered by Plaintiff. Additionally, throughout the trial, when testimony regarding non-compensable issues was elicited – often by Defendant's counsel in an attempt to show that Plaintiff's psychological injuries were not the result of Colaner's use of excessive force – Defendant had countless opportunities to request a limiting instruction pursuant to FED. R. EVID. 105, but failed to do so.  (4/19/10 Tr. at 58:4-5; 4/20/10 Tr. at 53:3-9; 4/21/10 Tr. at 133:11-14; 4/22/10 Tr. at 7:5-6, 15:5-16:10).  The instructions given do not constitute plain error.

**g. Statements Made by Plaintiff's Expert**

Lastly, Defendant argues that he is entitled to a new trial because Plaintiff's expert, Williams, testified improperly and erroneously.  Defendant never objected to any of Williams' testimony.  Thus, he waived his objections, and the Court reviews only for plain error.  *See Archibald*, 987 F.2d at 184 (citations omitted).

Defendant identifies approximately twenty instances of improper testimony from Williams that Defendant contends should have been stricken.  For example, Defendant identifies five statements made by Williams that Defendant asserts were not based on Williams' personal knowledge, and therefore were in violation of FED. R. EVID 602.  Defendant's counsel offered no objections to the testimony that he now challenges.  Further, he identifies only two cases for his proposition that Williams' "testimony should have been stricken as a series of impermissible net

opinions having no capacity to enlighten, but tremendous capacity to confuse and prejudice." (Def.'s Br. at 53).  Both cases are from out-of-circuit and inapposite to the present case because the parties made timely objections to the testimony in those cases, and thus the courts were not reviewing for plain error.  *See Thompson v. City of Chicago*, 472 F.3d 444, 458 (7th Cir. 2006); *White v. Geradot*, 2008 U.S. Dist. LEXIS 72436, *14-*20 (N.D. Ind. 2008).  Having reviewed each instance of Williams' allegedly improper testimony, the Court finds that, even when taking the statements in their totality after giving no credence to the arguments made in opposition by Plaintiff, Williams' testimony does not rise to the level of plain error.

Additionally, Defendant's argument that Williams erroneously "provided the jury with a flatly incorrect legal standard by suggesting that [the Attorney General's Policy] serves as the ultimate test for reasonableness[,]" (Def.'s Br. at 53), is belied by the transcript of his testimony. Williams never held out the Attorney General's Policy – the same policy that Defendant has attempted to use to justify his use of force – as determinative of whether Defendant used excessive force as a matter of law.  On redirect, Plaintiff's counsel read from the Policy, "It is the policy of the state of New Jersey that law enforcement officers will use only that force which is objectively reasonable and necessary[,]" and asked Williams if he agreed with this standard, and if this was the standard to which he had testified. (4/20/10 Tr. at 76:8-17).  Williams replied in the affirmative to both questions.  (*Id.* at 76:14-17).  When Plaintiff's counsel asked Williams if, in his opinion, Colaner had complied with the Policy, he replied in the negative.  (*Id.* at 76:18-20).  The language "objectively reasonable and necessary" is either less broad or equivalent to the actual jury instructions, which instructed the jury to determined whether Defendant's actions were "objectively reasonable in light of the facts and circumstances confronting" him at the time. Indeed, that is the standard the law requires; the fact that it was indicated in the State's Policy

merely reflects the state of the law, and the Policy does not state a different standard.   As an expert, Williams was permitted to answer the question pursuant to FED. R. EVID. 704, and thus no plain error is evident in his testimony.

Defendant's motion for a new trial is denied.

### 3. Defendant's Motion for Remittitur

Having denied Defendant's motions for judgment as a matter of law and a new trial, the Court addresses Defendant's last argument, which is that, on their face, both the jury's $500,000 award of compensatory damages and $4.5 million award of punitive damages are excessive and conscience-shocking, and thus both awards should be vacated or steeply remitted.

"[T]he remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive."   *Cortez v. Trans Union, LLC*, Nos. -- F.3d --, 08-2465, 08-2466, 2010 WL 3190882, *18 (3d. Cir. 2010) (quoting *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986)); *see also Keenan*, 983 F.2d at 469 ("We may grant a new trial or remittitur only if the verdict awarded by the district court is so grossly excessive as to shock the judicial conscience.") (citation omitted); *Gumbs v. Pueblo Intern., Inc.*, 823 F.2d 768, 771-773 (3d. Cir. 1987) ("[O]ur review of this question is severely limited . . .  [While] [a] jury has very broad discretion in measuring damages[,] . . . a jury may not . . .  treat an injury as though it were a winning lottery ticket. There must be a rational relationship between the specific injury sustained and the amount awarded.")

As the Third Circuit has explained, while the term 'remittitur' is often used by courts "to refer to any reduction in a damages award, including one which is imposed to satisfy constitutional due process concerns, the term is actually far more specific."   *Id.*   If   a   court determines that a verdict is constitutionally excessive, it has no choice but to reduce the verdict

"so that it conforms to the requirements of the due process clause." *Id.* at *19 (quoting *Johansen*

*v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999)) (citation omitted).   In

contrast, a court imposes remittitur when it believes the jury's award is unreasonable in light of

the facts that were before them.  *Id.*  The Third Circuit has advised, however, that

> the remedies available to a court when reducing a jury award
> based upon due process concerns are not necessarily the same as
> those available when a court exercises its discretion because it
> believes the amount of the award is inconsistent with the
> evidence in a case.  The latter is conditional, and the court must
> offer a new trial as an alternative to a reduction in the award in to
> avoid depriving the plaintiff of his/her Seventh Amendment right
> to a jury trial.

*Id.* (citing *Hetzel v. Prince William Cnty.*, 523 U.S. 208, 211, 118 S.Ct. 1210, 140 L.Ed.2d 336

(1998) (per curiam)).   When, however, a Court reduces a damages award that it finds

constitutionally excessive, the award is reduced as a matter of law without interference with the

plaintiff's Seventh Amendment right to have the jury determine the findings of fact.  *Id.*

### a. Remittitur of Compensatory Damages

"Unlike punitive damages that are intended to punish and deter, '[c]ompensatory

damages are intended to redress the concrete loss that the plaintiff has suffered by reason of

defendant's wrongful conduct.'" *Cortez*, 2010 WL 3190882, at *21.  Defendant seeks substantial

remittitur of the jury's award of $500,000 in compensatory damages.  Defendant argues that the

damage award is far in excess of what courts have upheld in similar excessive force cases, and

largely cites cases from the Second Circuit that are collected in *DiSorbo v. Hoy*, 343 F3d. 172,

184-185 (2d Cir. 2002).  *See* Def. Br. at 34-36.  Moreover, Defendant argues, in similar cases

"involving emotional distress claims for minor physical injuries," courts within this district have

been hesitant to uphold large awards.  (Def.'s Br. at 37) (citing "*Glass*, *supra*, 2008 U.S. Dist.

LEXIS 71241 (in which Judge Simandle remitted a $250,000 emotional distress award to

$50,000); *Lyles*, *supra*, 371 F.Supp.2d at 604-05; *cf. Blakey*, *supra*, 992 F.Supp. at 741 (remitting $500,000 emotional distress award to $250,000 where the plaintiff presented limited expert testimony and had limited treatment for non-permanent emotional distress).").   Defendant argues that here, where the jury has awarded $500,000 in compensatory damages, "as compensation for trauma arising from a six-second tussle in which plaintiff was a very active participant, resulting in a knot on his head and stinging scalp, the award is shocking and excessive and should be vacated or remitted."  (Pl.'s Br. at 37).

Plaintiff argues that the jury's compensatory damage award is supported by the evidence. This evidence includes proof of temporary physical harm he suffered at the hands of Plaintiff, as well as evidence of the pervasive psychological injuries he continues to suffer from, including persistent nightmares and flashbacks, recurring headaches, difficulty eating and sleeping, a loss of interest in friends and the enjoyment of life, a fear of police, and post-traumatic stress disorder.  (Pl.'s Br. at 34).  Plaintiff contends that, "[a]t only 36 years old, Wade will likely have to cope with these psychological symptoms for the rest of his life."  Plaintiff takes issue with Defendant's reliance on *DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003) and the other Second Circuit cases discussed therein, noting that while the Third Circuit has made clear that a "court may not require a reduction in the amount of the verdict to less than the 'maximum recovery' that does not shock the judicial conscience, *Gumbs*, 823 F.2d at 774, the law in the Second Circuit permits remittitur of a jury award that falls "within a reasonable range" of awards, *DiSorbo*, 343, F.3d at 185-86.  Pl.'s Br. at 36.

The Court finds Defendant's reliance on the out-of-circuit cases misplaced in light of the clear instruction from the Third Circuit that remittitur may only reduce the award to the maximum recovery that does not shock the judicial conscience.  Clearly, the Second Circuit

precedent cited by Defendant is inapposite since it uses a different standard.  Moreover, upon review of amounts made and approved in the Third Circuit precedent, the Court finds that the record supports the compensatory damage award here.  In *Evans v. Port Authority of N.Y. and N.J.*, 273 F.3d 355 (3d Cir. 2001), an employment discrimination lawsuit, the Third Circuit approved a district court's decision to order remittitur of a $1.15 million award of compensatory damages to $375,000. As Plaintiff points out, the $375,000 compensatory damage award in *Evans*, when adjusted for inflation, is approximately equal to $462,000 in current dollars.  (Pl.'s Br. at 35).  *See also*, *Gagliardo v. Connaught Labs.*, 311 F.3d 565, 573-74 (3d Cir. 2002) (affirming denial of motion for new trial and remittitur of $1.55 million damage award for pain and suffering based on testimony that plaintiff, who was afflicted with MS, changed from "happy and confident" to "withdrawn and indecisive" as a result of employment discrimination); *Ridley v. Costco Wholesale Corp.*, 217 Fed. App'x 130, 136-37 (3d Cir. 2007) (affirming $200,000 emotional distress damages award based on testimony of plaintiff and spouse that discrimination caused plaintiff to have difficulty sleeping, weight loss, social withdrawal and loss of self-esteem).

In *Glass v. Snellbaker*, 2008 WL 4371760 (D.N.J. September 17, 2008), where a police officer's First Amendment rights were violated, the court remitted a $250,000 emotional distress to $50,000.  Defendant argues that like the plaintiff in *Glass*, Wade suffered only minor physical injuries and non-permanent emotional distress.  Unlike the *Glass* plaintiff, however, who "reported no changes in sleep or other emotional effects," "did not testify that he suffered any lasting emotional distress or other non-economic injury" and failed to provide testimony regarding the emotional impact of the defendants' conduct or continuing emotional harm, here,

Plaintiff presented substantial testimony regarding the emotional impact that Defendant's conduct has had on his daily life and that these effects continue today.

The Court has already determined that the record amply supports the jury's finding of excessive force. Clearly, in light of the damages awards, the jury found credible Wade's testimony, as corroborated by his wife, that as a result of Defendant's use of excessive force Wade suffers persistent nightmares and flashbacks, suffers recurring headaches, has difficulty eating and sleeping, has lost interest in the enjoyment of life and is afraid to drive long distances. Viewing the facts in the light most favorable to Wade, the Court finds that the jury could reasonably have attributed significant emotional distress resulting from the incident and found that he will likely continue to suffer from these symptoms. The Court recognizes that while the compensatory damage award was generous, it is supported by the evidence and does not shock the judicial conscience.

**b. Remittitur of Punitive Damages**

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) Defendant contends that the jury's $4.5 million punitive award is so grossly excessive that it violates his right to due process. "In *Campbell*, the Supreme Court summarized the three guideposts a court reviewing punitive damages should consider: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Cortez*, 2010 WL 3190882, at *26 (quoting *Campbell*, 538 U.S. at 418).

**1. Degree of Reprehensibility**

"The Supreme Court has recognized that the degree of reprehensibility of the defendant's conduct is "[t]he most important indicium of the reasonableness of a punitive damages award." *CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.*, 499 F.3d 184, 190 (3d Cir. 2007) (quoting *Campbell*, 538 U.S. at 419).   In evaluating a jury's punitive damage award under this first guidepost, courts "must consider whether: "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *CGB Occupational Therapy, Inc.*, 499 F.3d at 190 (quoting Campbell, 38 U.S. at 419).

Here, it is clear that the evidence supports a finding of three of the five subfactors. Testimony supports a finding that Wade suffered physical as well as emotional harm, Defendant's conduct evinced an indifference to the health and safety of others; and the harm was the result of malice.   Plaintiff contends that this latter guidepost alone supports the size of the award.   The Court, however, is not convinced.   Although the evidence supports a finding of intentional malice, the tortious conduct is limited to a single isolated incident.   Based on this Court's consideration of this reprehensibility guidepost, it would appear that Defendant's conduct although reprehensible is not sufficiently egregious to warrant a punitive damages award of $4.5 million.   Accordingly, the Court turns to the remaining guideposts.

## 2.  Ratio of Punitive Damages to Harm

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff."   *CGB Occupational Therapy, Inc.*, 499 F.3d at 192 (quoting *Gore*, 517 U.S. at 580). "The Supreme

Court has been 'reluctant to identify concrete constitutional limits on the ratio,' instead emphasizing that 'the precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.'" *Id.* (quoting *Campbell*, 538 U.S. at 424-25). "It has cautioned, however, that 'in practice fee awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.*

Defendant argues that "[b]y any rational measure, the jury's award of compensatory damages was 'substantial' here, and the jury's 9:1 punitive-to-compensatory ratio excessive." (Pl.'s Br. at 39). Plaintiff counters that the 9:1 ratio is constitutionally permissible as it falls within the single-digit ratio. Citing *CGB Occupational Therapy, Inc.*, 499 F.3d at 193, Plaintiff contends that the Third Circuit has imposed a remitted punitive damages award with approximate 7:1 punitive to compensatory damages ratio. Plaintiff argues that given Defendant's conduct and the resulting harm to Plaintiff, the single-digit ratio of 9:1 does not offend due process. In support of that assertion, Plaintiff cites to out-of-circuit caselaw in which courts have upheld larger ratios in cases involving the vindication of constitutional rights. (Pl.'s Br. at 40 (citing *Romanski v. Detroie Entm't, LLC*, 428 F.3d 629, 646 (6th Cir. 2005), *cert. denied*, 549 U.S. 946 (2006) (in § 1983 case, ordering remittitur to a ratio of 2,150:1) *Williams v. Kaufman County*, 352 F.3d 994, 1016 (5th Cir. 2003) (affirming 10:1 ratio); *Lincoln v. Case*, 340 F.3d 283, 293 (5th Cir. 2003) (remitting to ratio of 110:1)).

As Defendant points out, however, the few out-of-circuit cases cited by Plaintiff involving analogous torts did not award punitive damages even approaching the magnitude of the $4.5 million award here. *See Romanski v. Detroie Entm't, LLC*, 428 F.3d 629 (remitting the punitive award of $875,000 to $600,000, noting that the high ratio was sustainable given that the

$279.05 compensatory damage award was "unusually low"); *Williams v. Kaufman County*, 352 F.3d 994 (affirming $15,000 punitive award where compensatory award for unlawful detention and invasion of privacy based on strip search was $100); *Lincoln v. Case*, 340 F.3d 283 (remitting punitive award from $100,000 to $55,000 where compensatory award in Fair Housing Act case was only $500).   The $4.5 million punitive damage award here does not bear a reasonable relationship to the reprehensibility of Defendant's use of excessive force and results in an unsustainable damages-to-harm ratio of 9:1.   The Court is cognizant of the fact that the ratio falls within the single-digit range, nevertheless, the Court finds that "it crosses the line into constitutional impropriety." *CGB Occupational Therapy, Inc.*, 499 F.3d at 193.   While the Supreme Court has held that ratios in excess of the single-digit range "may comport with due process in cases where 'a particularly egregious act has resulted in only a small amount of economic damages,' or where 'the injury is hard to detect or monetary value of noneconomic harm might have been difficult to determine'", *Id.* (quoting *Campbell*, 538 U.S. at 425), the Court finds the 9:1 ratio here unsustainable given the $500,000 compensatory award that, while not excessive, is at the upper limit of what the evidence will bear.

The Third Circuit has held that it is uncertain "as to how to properly apply" the third guidepost set forth in *Campbell*.   In *CGB Occupational Therapy, Inc.*, 499 F.3d at 190, the Third Circuit confined its analysis to the first two guideposts, noting that the third guidepost was not instructive in the tortious interference case. Plaintiff argues that Defendant has improperly applied this third guidepost, analyzing comparable punitive awards in similar cases, rather than civil penalties authorized in comparable cases.

Regardless of the proper application of the third guidepost, the Court is convinced that under the first two guideposts, the punitive damage award cannot stand.   In determining the

constitutional limit of a punitive damages award, the Third Circuit has held that the court "must accord 'a measure of deference' to the jury's award" and "is obliged to 'decrease the award to an amount the evidence will bear, which amount must necessarily be as high - and may well be higher - than the level the court would have deemed appropriate if working on a clean slate.'" *CGB Occupational Therapy, Inc.*, 499 F.3d at 193 (quoting *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 231 (3d Cir. 2005)).   The evidence here will simply not support a $4.5 million punitive award.  In arriving at the appropriate punitive damage award, the Court may take into consideration the financial strength of Defendant.  As the Third Circuit noted in *CGB Occupational Therapy, Inc.*, 499 F.3d at 193, "what 'may be awesome punishment for an impecunious individual defendant . . . [may be] wholly insufficient to influence the behavior of a prosperous corporation.'  *Continental Trend*, 101 F.3d at 641; *see Campbell*, 538 U.S. at 427-28, 123 S.Ct. 113 (observing that consideration of defendant's wealth is not 'unlawful or inappropriate' so long as it is not used to 'make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct.') (citation omitted)."  While Defendant's use of excessive force, as found by the jury, was indeed reprehensible, a punitive award of $4.5 million is not supportable here where Defendant testified to a net worth of approximately $100,000.  Given a compensatory award which reaches the upper bounds and Defendant's limited net worth, the Court finds that a punitive award in the amount of $2 million represents the constitutional upper limit in this case.


Dated:  December 28, 2010                              /s/            Freda L. Wolfson
                                                       The Honorable Freda L. Wolfson
                                                       United States District Court